# RUTH J. SAAF AND ANOTHER v. DULUTH POLICE PENSION RELIEF ASSOCIATION.[1]

July 24, 1953.

No. 36,013.

[1]Reported in 59 N. W. (2d) 883.

*Harry T. Lathrop,* for appellant.

*Smythe & Lindquist,* for respondents.

MATSON, JUSTICE.

Appeal by defendant from a judgment awarding plaintiffs certain pension benefits as dependents of a deceased member of the police force of the city of Duluth.

Plaintiffs are the surviving spouse and minor child of Donald Saaf, decedent. They brought this action to recover dependency pension payments from the defendant, the Duluth Police Pension Relief Association. The district court found that plaintiffs were entitled to recover and entered a judgment from which defendant appeals.

The defendant association is operating pursuant to L. 1943, c. 267, which provides that police pension associations such as defendant may pay *disability* and *dependency* pensions in such amounts and in such manner as its articles of incorporation, constitution, and bylaws shall designate but not exceeding certain limitations prescribed in the statute. Section 1 of c. 267 provides for the payment of a disability pension when a member of such an association "has been permanently disabled physically or mentally *because of* any injury *received or suffered while a duly authorized member of such paid municipal police department* so as to render necessary his retirement from active police service." (Italics supplied.) Section 3 of c. 267 provides that dependency pensions "shall be paid to any widow, or child under 16 years of age, of any such pensioned and retired member of the police department, or to any widow, or child under 16 years of age, of any *member who dies while in the service of the police department of any such city,* * * *."* (Italics supplied.) The defendant association's purpose is to provide its members and their widows and children with pensions. The *defendant concedes*

that plaintiffs are entitled to receive a dependency pension if any injury suffered by decedent while a member of the Duluth police force caused him permanent mental or physical disability *or* if decedent was a member of the defendant association at the time of his death. The trial court made findings that decedent's permanent disability and resulting death was caused by an injury received while decedent was on duty with the Duluth police department and also that the defendant association was estopped to deny that decedent was a member of the defendant at the time of his death.

We are concerned only with the issues (1) whether the evidence supports a finding that decedent, while a member of the police force, received a physical injury which was a proximate cause of his death and (2) whether upon the evidence the defendant association is estopped to deny that decedent at the time of his death was one of its members.

On March 7, 1947, the decedent, while on active duty as a police officer, was struck a stiff shoulder punch or blow on the right cheek' or jaw by a person who was under the influence of liquor. The blow received had no immediate disabling effect, and decedent continued his work as a police officer during the months following the accident. Early in the summer of 1947 decedent's partner, who had been with him on the night of March 7, 1947, noticed that decedent's left eyelid began to flicker and that decedent began to talk about his health, saying that it was good. About the middle of April 1948 decedent was seized with a convulsion. More convulsions followed, and decedent consulted Dr. S. E. Urberg on or about May 2, 1948, who made a diagnosis of a brain tumor. An operation followed for the removal of the tumor on May 17, 1948. Decedent convalesced at home for several months after the operation and then returned to his work as a patrolman on August 18, 1948.

Decedent continued to work until September 28, 1948, when he again was required to leave work because of a convulsive seizure. Ray Keating, then chief of police, suggested that decedent apply for a leave of absence. Keating brought the petition for leave to decedent's home for him to sign and presented the signed petition to

the civil service board for the city of Duluth. The leave of absence was granted by the board for a period of one year commencing November 3, 1948. Decedent's wife, Mrs. Ruth J. Saaf, testified that when Keating brought the petition to her home for her husband to sign he stated that he would extend the leave if necessary. Therefore, sometime in October 1949, when it became apparent that decedent would not be able to return to work prior to the expiration of his leave of absence on November 3, Mrs. Saaf wrote Keating requesting that the leave be extended if possible. She received an answer from the chief's office stating that the appointing authority had no power to extend the leave of absence. No application for further leave was ever made to the civil service board. The decedent died on November 18, 1949.

■ We turn to the first issue which concerns the proximate cause of decedent's death. There is much medical testimony in the record on the question of whether the brain tumor, which was the immediate cause of decedent's death, was influenced in its development or aggravated by the blow received on the night of March 7, 1947. The evidence, however, clearly does not sustain a finding that the blow was the *originating cause* of the tumor. Dr. Urberg, plaintiffs' medical witness, testified repeatedly that the cause of brain tumors is unknown. He stated that the area of an injury from a blow might provide a favorable situs for the development of a brain tumor and could influence a tumor's rate of growth. He definitely could not say that the blow could have been an originating cause. On the other hand, Dr. Gordon J. Strewler, while corroborating Dr. Urberg's statement that the cause of brain tumors is unknown, testified that it has been definitely ascertained through experimentation that certain things will not cause brain tumors and that an astrocytoma tumor—the type which caused decedent's death—could not be caused by a trauma or blow on the head.

The question remains, however, whether the evidence sustains a finding that the blow aggravated a latent or pre-existing tumor and accelerated its growth. This question presupposes that the existence of the tumor, at least in latent form, antedated the blow sustained

on March 7, 1947. The evidence is wholly speculative as to the time of its inception. Its inception may have been at a time even prior to 1941 when the decedent was discharged from the navy for medical reasons.[2] For the purpose, however, of deciding the issue of whether the evidence sustains a finding that the blow to decedent's jaw aggravated a latent tumor and contributed proximately to its development so as to establish a causal connection between the injury to the jaw and the subsequent death, we need only assume that the tumor existed prior to March 7, 1947.

In passing upon the specific evidence regarding aggravation, it is to be noted that we are not here concerned with a case where death is so immediately, directly, or naturally and probably the proximate result of the injury that any layman of average intelligence, without the aid of a medical expert, would know from his own knowledge and experience that the injury was the cause of death.[3] Instead we have a case wherein, if the brain tumor as the immediate cause of death is to be causally connected with a blow to decedent's jaw as an initiating and proximate cause of death, we are dealing with obscure and abstruse medical factors of which a layman can reasonably have no well-founded knowledge and concerning which, without adequate expert medical testimony to provide a proper foundation, he can do no more in making a finding than indulge in mere speculation. Furthermore, the mere fact that the injury from the blow to the jaw *might* have been a possible contributing cause of death does not of itself justify a finding of a causal relation. Where expert testimony must be *solely* relied on

---

[2] In connection with decedent's medical discharge from the navy in 1941—long prior to his connection with the Duluth police force—the discharge records show that during his naval service he had suffered from dizziness and high blood pressure, and this fact led Dr. Urberg to believe that the inception of the tumor possibly antedated these symptoms and therefore also antedated the blow to decedent's jaw.

[3] See, Burton v. Holden & Martin Lbr. Co. 112 Vt. 17, 20 A. (2d) 99, 135 A. L. R. 512; McCoy v. Spriggs, 102 Pa. Super. 500, 157 A. 523; Honer v. Nicholson; 198 Minn. 55, 59, 268 N. W. 852, 854; Annotation, 135 A. L. R. 516.

to show the causal connection between the alleged cause and a certain subsequent result—either disability or death—, medical testimony which does nothing more than show a mere possibility, suspicion, or conjecture that such causal relation exists, without any foundation for the exclusion of other admittedly possible causes, provides no proper foundation for a finding of a causal connection.[4] Affirmatively stated, in order to have a proper foundation for a finding of causal connection, in cases where such connection must be established *solely* by expert testimony, the medical expert must *upon an adequate factual foundation*[5] testify not only that in his professional opinion the injury in question *might* have caused or contributed to the subsequent death of the injured person but further that such injury *did* cause or contribute to his death, but such medical testimony need not be couched in any particular words.[6] As applied to the facts of the particular case, it need only appear from the testimony of the medical witness as a whole that he is of the opinion that the injury *not only could but did* cause the injured person's death but such expert opinion need not be expressive of absolute certainty. In Hiber v. City of St. Paul, 219 Minn. 87, 93, 16 N. W. (2d) 878, 881, we said:

"'* * * It is not necessary that the truth of an expert's opinion be capable of demonstration; it is sufficient that it is probably true. 'He [an expert witness] is not required to speak with such confidence as to exclude all doubts in his mind, but may render his testimony in the form of an estimate of opinion, couched in expressions that fall short of absolute conviction of accuracy. Such qualification affects merely the probative force of the testimony.' 20 Am.

[4]See, Wallstedt v. Swedish Hospital, 220 Minn. 274, 19 N. W. (2d) 426; 20 Am. Jur., Evidence, § 1178.

[5]Hiber v. City of St. Paul, 219 Minn. 87, 16 N. W. (2d) 878; Mageau v. G. N. Ry. Co. 106 Minn. 375, 119 N. W. 200; Smith v. Twin City Motor Bus Co. 228 Minn. 14, 36 N. W. (2d) 22; 7 Dunnell, Dig. (3 ed.) § 3334.

[6]As to the lack of necessity for the use of any particular words, see Hiber v. City of St. Paul, 219 Minn. 87, 16 N. W. (2d) 878; Annotation, 135 A. L. R. 516, 541 to 546.

Jur., Evidence, § 768. See, Kundiger v. Metropolitan L. Ins. Co. 218 Minn. 273, 15 N. W. (2d) 487."[7]

Applying these principles, we find that Dr. Urberg never ventured an opinion as to whether the blow *did in fact* aggravate decedent's brain tumor. He testified only generally with respect to similar cases and not with respect to the specific facts of this case that an injury of *some magnitude could perhaps* alter the natural course of a pre-existing condition. The supposition that a blow or severe bruise could at least aggravate a latent condition he said had been accepted as a reasonable probability in a number of instances. He stated that the phrase "an injury of some magnitude" could refer to an injury as little as a stunning of the victim not involving a loss of consciousness. With respect to the facts herein, he said nothing more than that, if an injury of some reasonable magnitude has taken place, "it *may* have some bearing on the development of a condition such as Mr. Saaf had." Taking Dr. Urberg's testimony as a whole, it can be reasonably construed only to the effect that his opinion went no further than that the blow to decedent's jaw *might or could possibly* have aggravated a pre-existing tumor.

Contrasted with Dr. Urberg's testimony is that of Dr. Strewler, a specialist in the field of brain tumors. Upon a hypothetical question, Dr. Strewler stated that in his opinion the blow suffered by decedent could not have aggravated an astrocytoma brain tumor. He based his opinion on the fact that the lapsed time between the trauma and the first objective evidence that decedent was suffering from a tumor was of such duration as to indicate no causal connection between the trauma and the development of the tumor. The medical testimony and the remainder of the record in this case is such that we must hold that the evidence is insufficient to support a finding that the blow to decedent's jaw aggravated a pre-existing brain tumor which resulted first in his permanent disability and then in his death.

[7]See, Ripani v. Dittman, 297 Pa. 124, 146 A. 562; 7 Dunnell, Dig. (3 ed.) § 3334.

■ We have here concluded that expert testimony must be solely relied upon to show the causal connection because the evidentiary facts aside from such expert testimony are equally consistent with a finding either way. The flickering of decedent's eyelid in the early summer of 1947 does not justify an inference that it was any more symptomatic of a tumor caused or aggravated by an injury to the jaw than a tumor which had no connection with such injury. Like considerations apply to decedent's health before and after the injury. Where two opposing inferences can be drawn with equal justification from the same circumstantial evidence so that one inference cannot reasonably be preferred over the other, neither is of evidentiary weight in support of a court's finding even though consistent with it and both must be rejected as purely speculative.[8] We do not here have circumstantial facts which so closely and directly connect the trauma with the immediate cause of death as to lead to the reasonable and probable inference that the trauma was the originating and proximate cause of death, in corroboration of expert medical opinion, as was the case in Jorstad v. Benefit Assn. of Ry. Employees, 196 Minn. 568, 265 N. W. 814.

■ We come to the second issue which is whether the defendant association is estopped to deny that decedent was one of its members when he died. Defendant concedes that if decedent was a member plaintiffs are entitled to a dependency pension irrespective of the cause of death. Membership in the defendant association is contingent upon membership in the Duluth police department. It is clear that decedent was not a member of the police force of that city at the time of his death. Under § 156 of the civil service rules for the city of Duluth, decedent was presumed and considered to have resigned from the police department when he did not notify the secretary of the civil service board within five days after the expiration of his leave of absence on November 3, 1949, of his readiness to resume his duties. Plaintiffs assert, however, and the trial court so found, that defendant was estopped to deny that decedent

[8]See, Burke v. B. F. Nelson Mfg. Co. 219 Minn. 381, 18 N. W. (2d) 121; 7 Dunnell, Dig. (3 ed.) § 3234.

was a member of the association at the time of his death. The court's finding in estoppel is predicated upon the representation made by chief of police Keating when he brought the petition for a leave of absence to decedent's home for him to sign. Plaintiff testified that at that time Keating stated that he would extend the leave of absence if necessary. We fail, however, to see how this representation can provide the basis for an estoppel in this case.

One of the essential elements of equitable estoppel, or estoppel *in pais,* is that the party asserting the estoppel acted, or failed to act, in reliance upon the representation claimed to give rise to the estoppel whereby he has changed his position for the worse.[9] Here the plaintiff Mrs. Saaf did not act, or fail to act, in reliance on Keating's statement whereby her position was in any way changed from that which she would otherwise have occupied. In the absence of Keating's statement, she would nevertheless have had to make an application for an extension of her husband's leave of absence. This is exactly what she did in this case. Sometime in October 1949 she wrote a letter to Keating asking if it was "possible" to extend the leave. She received an answer from Keating's office that the appointing authority had no power to grant an additional special leave of absence. Apparently neither Keating as the appointing authority, nor the civil service board, nor both together, had power under § 114 of the civil service rules for the city of Duluth to extend a special leave of absence or grant an additional leave once an applicant had used a full year's leave without subsequently returning to his duties for a period of time. We need not, however, construe § 114 to determine whether the board upon proper application had power to grant an additional special leave of absence to the decedent. There is no allegation in the pleadings, or evidence in the record, to indicate that anyone made a representation to Mrs. Saaf or decedent that induced her or the decedent *to refrain* from apply-

---

[9]Kavalaris v. Cordalis, 219 Minn. 442, 18 N. W. (2d) 137; Schaefer v. Nylin, 162 Minn. 170, 202 N. W. 439; see, Union Public Service Co. v. Village of Minneota, 212 Minn. 92, 98, 2 N. W. (2d) 555, 558; 6 Dunnell, Dig. (3 ed.) §§ 3187, 3191; 19 Am. Jur., Estoppel, § 84.

ing to the civil service board for an additional leave for her husband. A change of position for the worse as a basis for estoppel cannot be presumed and is a matter calling for proof. Schaefer v. Nylin, 162 Minn. 170, 202 N. W. 439.

We have a further contention in the nature of an alleged estoppel by delay. The record discloses that early in April 1949 decedent applied in writing to the defendant association for a disability pension. On April 20, 1949, the defendant appointed a committee to investigate the merits of decedent's application. At a special meeting of defendant's governing board on October 28, 1949, decedent's pension application was discussed, but the matter was laid over for final decision until after November 6, 1949, which was a date subsequent to the expiration of decedent's one-year leave of absence from the police department. Plaintiff asserts that defendant's failure to grant promptly, or at least deny, decedent's application for a disability pension provides an additional ground for the recovery of dependency benefits. Such delay obviously has no bearing upon the issue of whether defendant is estopped to deny that decedent was a member of the association since the right to a dependency pension solely on the basis of *membership* at the time of death is separate and distinct from any right to a pension on the basis that decedent qualified for a pension for *disability* on the date of his death. Plaintiffs further contend, however, that the delay denied decedent an opportunity to take such steps during his lifetime as might be necessary to obtain his pension had defendant promptly denied his application. Although plaintiffs' theory is not clear, apparently they urge that the doctrine of estoppel by delay be uniquely applied in this case.[10] Even assuming that the delay of the governing board was unreasonable here, plaintiffs cannot prevail on this theory because they have made no showing of prejudice occasioned by the delay. What prejudice could there possibly be under the circumstances? If the board had promptly denied decedent's application, decedent's only recourse would have been a possi-

---

[10]For a general discussion of estoppel by delay, see 19 Am. Jur., Estoppel, § 59.

ble resort to the courts for relief, and a court would then most likely have had to consider the identical question of proximate cause that was raised on this appeal. It does not appear that decedent could have, at a trial conducted during his lifetime, produced evidence in court more favorable to the allowance of a disability pension than the evidence produced in the trial below. The facts surrounding the blow to decedent's head are undisputed. The cause and nature of his subsequent illness and disability were before death, as well as after, a matter to be determined by expert medical testimony. It is not to be presumed that decedent could have added anything material in the form of admissible evidence on the issue of the proximate cause of his disability. His subjective symptoms would have to be evaluated by a medical expert, and in this connection it is not to be overlooked that plaintiffs' medical witness on the trial below was decedent's attending physician who undoubtedly had knowledge of any such subjective symptoms. Furthermore, plaintiffs cannot now be heard to complain when neither decedent nor Mrs. Saaf took any steps during decedent's lifetime to procure a more prompt determination on decedent's application for a disability pension.

The evidence is insufficient to support the trial court's finding that decedent's fatal brain tumor was the result of, or was aggravated by, the injury sustained when he was struck on the jaw. The evidence also fails to sustain a finding of the essential elements for an estoppel.

The judgment of the trial court is reversed.

Reversed.

MR. JUSTICE NELSON, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.