EVA ROSVOLD v. INDEPENDENT CONSOLIDATED SCHOOL DISTRICT NO. 102 AND ANOTHER.

87 N. W. (2d) 646.

January 17, 1958—No. 37,206.

*C. A. Stark,* for relators.
*Arnold M. Bellis* and *Robins, Davis & Lyons,* for respondent.

Magney, Commissioner.

Certiorari to review a decision of the Industrial Commission granting compensation to widow of deceased employee.

The referee found that on September 4, 1953, Oscar Rosvold was employed under a Minnesota contract of hire by Independent Consolidated School District No. 102 at a weekly wage of $120; that said employee died on September 5, 1953, but that said death bore no causal relationship to said employment; and that the employer and insurer had statutory notice and knowledge of said death within 90 days thereof. On appeal, the Industrial Commission held all the findings of the referee in accord with the evidence and the law, with one exception. It held that on September 4, 1953, employee sustained a personal injury which arose out of and in the course of his employment, resulting in his death on September 5, 1953.

Rosvold was a good mechanic and fast worker. He was 53 years of age and weighed 180 pounds. The school district contemplated hiring him as a bus driver, so he took the routine physical examination about a week before he died. The doctor passed him. No cardiogram was taken. About four years before he had had a two weeks' disabling illness.

On September 2, 1953, Rosvold and his helper, Elroy Parpart, made various repairs at the St. Paul Park school, one of employer's schools. Everything was normal. On September 3, they worked at the Cottage Grove school, changing two lavatory vents which were ineffectively carrying away odors from the toilets. The two pipes passed through the lavatory ceiling into a small attic and then across the attic through a wall into the larger attic of the school building. They were to take the old pipes out and run new ones through the roof of the lavatory addition. A trapdoor 24 inches square opened up into the attic, and a stepladder was used to reach it. The attic ceiling sloped down to meet the floor. There were no windows or lights in the attic. The men climbed up and down the ladder bringing up their equipment. The preceding day had been one of the hottest in the year, and the intense heat still remained in the attic. The odor was strong even before the pipes were disconnected, and both men perspired freely. The main part of the work had to be done where the ceiling was only two feet from

the floor joists. That is where the pipes came through. As the pipes became disconnected, the odor became unbearable. Parpart said that he felt choked up and his eyes smarted. After the pipes had been disconnected, Parpart went outside on the roof. Rosvold stayed inside to drill a hole through the roof so that Parpart, from the outside, could cut an opening for the pipes. Rosvold had to get into a cramped position under the low roof, lying practically on his side, and, with an outward, upward pressure, use the bit drill to make the hole. While drilling the first hole, Rosvold hurriedly came out of the attic, gained the outside, and vomited. Afterward he complained that the smell was unbearable and that he felt choked up. He seemed weak and pale. He returned slowly to the attic. The odor was nauseating, even to Parpart on the roof. After the hole was cut, the two men took rasps to rasp out the hole so that it would fit the pipe, Rosvold working from the inside in the cramped position. He was perspiring freely and breathing heavily, his eyes were watery, and he complained about being all choked up. He could not stay in the attic more than a few minutes at a time. He walked slowly and was pale. During the fitting of the second pipe, Rosvold vomited again, going outside the building as before. He complained about his chest and the odor and seemed groggy while walking. He had to get out for fresh air often.

That afternoon Rosvold did his work slowly. The men hooked up the pipes on the roof and raised them. Then they climbed up the ladder into the main attic to disconnect some other pipes. He complained that afternoon a great deal about his chest. He looked pale and did his work with a great deal of difficulty. That evening he was active but looked pale, unusually tired, and sick. The next morning he complained about having a sewer-gas taste in his mouth and pains in his chest, as if filled up with gas. That day the men did some work at the St. Paul Park school. He could not do the heavy work and complained about his chest. He was pale and worked and walked slowly. After six hours, he went home. That evening he and his wife went to the Montgomery Ward store to purchase some belting to be put on some swings the next day. He and Lauren Amdahl, the superintendent, had talked this over. At Ward's he had three vomiting spells. They came home at 10 o'clock. At 11 o'clock he was doubled up with

pain in his chest and in his stomach. Severe pains were shooting into both arms. He was taken to the hospital and after 15 minutes he expired. No autopsy was held. Dr. William J. Watson, who arrived a few minutes later, diagnosed the cause of death as coronary thrombosis.

On the above facts and others not here detailed, Dr. Moses Barron, a specialist in the field of internal medicine, called by petitioner, testified that in his opinion the type of work and the conditions under which employee worked brought about a heart condition which very likely was a coronary thrombosis, which progressed to death on September 5.

Dr. John Fee, also a specialist in internal medicine, called by petitioner, was of the opinion that Rosvold suffered coronary insufficiency during the time he worked in the attic, brought about by the work and conditions then existing, and that this insufficiency continued on to myocardial infarction and that he died of myocardial infarction or coronary thrombosis.

Dr. Charles N. Hensel, also a specialist in internal medicine, called by the employer, testified that no coronary picture was established until about 11 or 11:30 p. m. on the evening of September 4 and that there was no causal connection between Rosvold's experiences in the attic and the coronary thrombosis from which he died.

Employer claims that there was no causal connection between Rosvold's work in the lavatory attic and the coronary thrombosis from which he died and that the commission erred in finding that there was. So we have here a situation which arises often in compensation cases. An employee dies from some disease, such as cancer, stroke, coronary thrombosis, as here, or some other disease, having had experiences in the course of his work which it is claimed were the cause of his death. Competent medical experts are called in to give their opinions as to whether there is causal connection between these work experiences and his death. Those called by petitioner will testify that there is such causal connection, while those called by the employer will say that there is no such connection. It does not follow that their opinions are colored or influenced by reason of the fact that they are called by the one side or the other. In many fields of medicine there is still much room for disagreement among experts, but the number of

such fields is becoming less and less. As medical science progresses, it is expected that more and more conflicts will be resolved. But while these disagreements or conflicts are still going on, finders of fact and courts generally must make decisions.

In Golob v. Buckingham Hotel, 244 Minn. 301, 304, 69 N. W. (2d) 636, 639, where we had occasion to discuss this problem, we said:

"* * * It would be of no value to set forth the opposing views of the medical experts. It is sufficient to say that it is apparent that in this field of medicine, as well as others, even those specializing in the field do not agree on the question whether trauma or exertion can cause the formation of a blood clot and the resulting thrombosis. * * * until the time comes when medical knowledge has progressed to such a point that experts in the field of medicine can agree, causal relation in determining compensable injury or disease will have to remain in the province of the trier of fact."

In affirming the award in that case, the court held that the finding of the commission was adequately supported by the evidence. So here, the finding of the commission is adequately supported by the evidence. The determination of the question of causation on conflicting expert testimony is no different than the determination of any other question of fact where witnesses disagree.

■ The school district also contends that the commission erred in holding that Rosvold was an employee and not an independent contractor. In determining whether an individual at a given time is an employee or an independent contractor, several factors must be considered. In Fahey v. Terp, 235 Minn. 432, 433, 51 N. W. (2d) 273, 274, quoting from Lemkuhl v. Clark, 209 Minn. 276, 277, 296 N. W. 28, 29, this court said:

"In determining whether the relationship is one of employe or independent contractor, the most important factor is the right of the employer to control the means and manner of performance. Other factors to be considered are mode of payment, furnishing of materials or tools, control of the premises where the work is to be done, and the right of the employer to discharge the employe-contractor."

Numerous small jobs were assigned to Rosvold, some of them requiring considerable skill, but much of the work he did was not of a technical nature. He furnished his own tools, except ladders, much the same as a carpenter on a construction job. He furnished certain materials but was paid for them by the school district exactly what they cost him. An independent contractor would have been entitled to add a reasonable profit. Both he and Parpart were paid by the hour and not a lump sum for any particular job. The places of his work were either school buildings or grounds controlled entirely by the district. The work was performed in the regular business of the district. He could have been discharged at any time. If in the midst of his work in connection with the lavatory pipes he had been discharged, he might have complained but not on the ground that his contract had been broken. He had none. The fact that Rosvold was a good mechanic and a good worker made little supervision necessary, probably none, except to direct him what to do and where to do it and what materials he should purchase. But the right to control the manner and means of the work clearly was in the district and its superintendent, Amdahl, who considered that such was the case. In this connection, there was no difference between Rosvold and his helper and the other men who were doing repair and maintenance work. The commission did not err in holding that Rosvold was an employee and not an independent contractor. The evidence clearly supports such finding.

■ The referee and the commission found that the employer and the insurer had statutory notice and knowledge of Rosvold's death within 90 days thereof. Employer contends that there is no evidence in the record to support such finding. The statute involved is M. S. A. 176.141, which reads in part as follows:

"* * * Unless knowledge is obtained or written notice given within 90 days after the occurrence of the injury no compensation shall be allowed."

No written notice was given the employer at any time of Rosvold's death. To satisfy the statute, therefore, it must be shown that employer had knowledge thereof within the time limit. Amdahl, employer's superintendent, attended Rosvold's funeral and shortly afterward came

to the widow's home and secured his time book and statement of his expenditures. He therefore knew that Rosvold had died and that, at that time, he was still an employee of the school district. He knew the kind of work Rosvold had performed, including that in the attic. It is fair to assume that he also knew the manner of death. It is also fair to assume that he did not associate the death with any work which Rosvold had performed. In a case such as this, death as related to work is not within the knowledge of the average lay person, and experts disagree, as is evidenced here. Any knowledge that Amdahl had was the knowledge of the employer. It contends, however, that the requirement of the statute is not satisfied by the mere knowledge of death but that, in addition thereto, employer must have received knowledge of the relation or connection between the death and the work in which the employee was engaged.

In the first place, the statute does not require the additional knowledge mentioned. All it requires is knowledge of the injury within a certain time. Under our decisions, injury occurs only when disability appears or becomes manifest. In Clausen v. Minnesota Steel Co. 186 Minn. 80, 84, 242 N. W. 397, 398, the court said:

"The workmen's compensation act does not contemplate the payment of damages for accidental injuries, no matter how painful. It is only the disability or loss of earning power which results from the injuries that calls for compensation. So when the act speaks of the occurrence of injury it refers to compensable injuries, and these occur when disability appears."

To the same effect are Pease v. Minnesota Steel Co. 196 Minn. 552, 265 N. W. 427, 266 N. W. 854, and Keane v. Arrowhead Steel Products Co. 181 Minn. 359, 232 N. W. 621.

Rosvold was able to continue to work after his experiences in the attic and up to the time of his death. If one may use the term in such a way, death was the injury in this case because no compensation was payable up to that time since Rosvold continued working. If death is the injury under the facts in this case, the employer had adequate knowledge of the occurrence of the injury shortly thereafter, and the statute was fully complied with.

In Sobczyk v. City of Duluth, 245 Minn. 569, 73 N. W. (2d) 795, employee sustained a heart injury at work on August 18, 1952. He was examined by a doctor on January 19, 1953, when the injury first became apparent to him. The first notice or knowledge the employer had was when the petition was filed in August 1953, over six months later. The manifestation of the injury and resulting disability occurred immediately following the doctor's examination, and the claim was denied because the employee failed to give notice within 90 days after January 19, 1953.

The claim of a dependent is here involved, not that of an employee. If knowledge of injury is sufficient to satisfy the statute, knowledge of death must also be sufficient. Any connection between employee's work and his death is a matter for investigation but not a requirement in connection with notice or knowledge. The referee and the commission did not err in finding that the employer had statutory notice and knowledge of the death within 90 days thereof.

Petitioner is allowed $300 attorneys' fees in this court.

Affirmed.