# CHARLOTTE FITCH v. FARMERS UNION GRAIN TERMINAL ASSOCIATION (AMBER MILLING DIVISION).

143 N. W. (2d) 192.

June 3, 1966—No. 39,718.

*Tyrrell, Jardine, Logan & O'Brien* and *Raymond W. Fitch,* for relators. *Patrick McGuire, McGuire & McGuire,* and *M. J. McKeon,* for respondent.

Thomas Gallagher, Justice.

Certiorari upon the relation of the employer and its insurer to review a decision of the Industrial Commission that Edward Lee Fitch, deceased employee of Farmers Union Grain Terminal Association, had suffered temporary total disability subsequent to December 20, 1957, for a total of 145.2 weeks due to an occupational disease described as bronchial asthma and emphysema contracted by the employee as a result of his exposure to grain, flour dust, and insect spray fumigants throughout his long employment by the employer; and that such disease bore a 50-percent relationship to the causes of his death on October 2, 1960.

The commission awarded Charlotte Fitch, widow of the employee, $6,534 compensation for employee's temporary total disability as described; $5,483 for 50 percent of the statutory compensation for his death; full medical and hospital expenses necessitated by the occupational disease; 50 percent of hospital and medical expenses for hospitalization between September 26, 1960, and October 2, 1960; and $225 statutory funeral expenses.

The evidence disclosed that Edward Lee Fitch was 62 years of age at the time of his death and had worked for the employer and its predecessor since 1933; that his employment by Farmers Union commenced in 1942 and continued until July 12, 1957, when it was terminated by the employee because of his inability to perform his work; that for the first 7 years of his employment by Farmers Union he had worked as an oiler and had been required to sweep out accumulated dust and flour waste from floors and downspouts; that on July 1, 1949, he commenced work as a warehouseman and continued in this capacity until he terminated his employment; that as a warehouseman he was required to clean and sweep out flour and dust from railway boxcars; that in this cleaning it was customary to use an air pressure system which would raise a substantial amount of dust; that at regular intervals the mills were fumigated with gas to kill insects and that after such fumigation the odor of the gas would hang about the areas in which the workers were employed and would cause their eyes to water and smart and their lungs to burn so as to make breathing difficult.

The evidence further disclosed that in 1947 this employee began to

have difficulty in breathing and would often find himself short of breath; that he would cough and wheeze frequently; that in his last year of work he would tire easily; that during the last months of his work his respiratory condition made it impossible to do ordinary chores around his house; and that on July 12, 1957, he quit work because of pain in his right leg.

On July 17, 1957, the employee was admitted to The Charles T. Miller Hospital in St. Paul where records disclose that he was then suffering from asthma and had suffered from it for several years. In August 1957 he was examined at the Mayo Clinic in Rochester where it was found that he was suffering from intermittent claudication which interfered seriously with his work and which suggested a recent occlusion. A general diagnosis then made disclosed that he was suffering from arteriosclerosis obliterans and that his breathing problem was due to asthmatic bronchitis with chronic pulmonary emphysema. On September 7, 1957, a lumbar sympathectomy was performed upon him at the Mayo Clinic.

On September 20, 1957, the employee was admitted to Rush City Hospital where he was treated by Dr. Joseph Halpin for pneumonia until September 26. On November 27 and December 18, 1957, he saw Dr. Halpin because of asthmatic attacks. On December 20, 1957, employee was hospitalized at Asbury Methodist Hospital in Minneapolis where records disclose that he again gave a history of asthma for the past 15 years and said it had "not bothered him very much" until the past two months.

On June 16, 1958, the employee was again hospitalized at Miller Hospital where he was treated for pulmonary congestion. He remained there through June 24, 1958, and the records again indicate his complaints of asthma. On June 30, 1958, he was again hospitalized at Rush City Hospital for a respiratory infection and for asthma which he then reported had bothered him for the past 8 to 12 months. He remained at this hospital until July 3, 1958, and returned to it between July 18 and July 24, 1958, and again between August 4 and August 9, 1958, for treatment of his asthma. Throughout this period, Dr. Halpin administered antibiotics to him for his respiratory condition. Dr. Morris Johnson, an internist, testified that X rays taken during this period suggested progressive pulmonary emphysema with cor pulmonale (pulmonary heart

disease). On September 20, 1960, following an acute chest pain, the employee was taken to Rush City Hospital where an electrocardiogram disclosed a myocardial infarction. Thereafter he was hospitalized continuously at this hospital until his death on October 2, 1960. During this period hospital records indicate his breathing was difficult and oxygen was required by him during part of each day. All medical experts agree that he died of a myocardial infarction, but an issue developed as to whether the asthmatic condition or emphysema was a contributing factor therein.

As indicated above, the commission found that the employee's exposure to grain, flour dust, and fumigants during the entire period of his employment caused him to contract bronchial asthma and emphysema which totally disabled him between December 20, 1957, and October 2, 1960; that while one cause of his death was his arteriosclerotic heart condition unrelated to his employment, his occupational disease—bronchial asthma and emphysema—was a 50-percent factor therein. The compensation award was based upon the commission's determination that his hospitalization between September 20 and September 26, 1957, was the result of a pneumonic condition not related to his employment, but that his hospitalizations subsequent to September 26, 1957, were necessitated in whole or in part by the occupational disease described.

On April 8, 1958, the employee filed a claim for permanent total disability under a nonindustrial group insurance plan. Therein he stated that a lumbar sympathectomy had been performed at Mayo Clinic to relieve hardening of the arteries and that since this operation he had developed asthma. On July 11, 1958, the hospital records of the employee's stay at Miller Hospital from June 18 to June 24, 1958, were examined by relator insurer. Various other hospital records indicate that upon hospitalization the employee disclosed that he had hospitalization insurance furnished by employer and that he authorized one of the hospitals to permit its insurer to examine the hospital records. Evidence was submitted that employer maintained a claim department and that each claim against it was examined by its employees and then turned over to its insurer.

The Rush City Hospital records covering employee's hospitalization between September 20, 1957, and September 26, 1957, some 10 weeks after his employment had been terminated, establish that he was then suffering from a respiratory condition and was wheezing and coughing.

On October 17, 1960, attorneys for petitioner notified the employer in writing that the employee had died on October 2, 1960, and that his death had been caused by an occupational disease and a heart attack, both claimed to have arisen out of his employment, for which compensation was claimed.

Relators contend that the decision of the Industrial Commission should be reversed because:

(1) The finding of the Industrial Commission that the employer had due notice and knowledge of an occupational disease which resulted in the disability of the employee commencing December 20, 1957, is not sustained by the evidence.

(2) The evidence is inadequate to sustain the finding by the Industrial Commission (a) that the employee contracted pulmonary disease as a result of his exposure to employment conditions prevailing at his place of employment while he was working there; and (b) that the pulmonary disease was a proximate cause of death.

(3) An award of disability benefits by the Industrial Commission was not requested by the employee.

(4) The award of proportionate death benefits by the Industrial Commission pursuant to Minn. St. 176.661 was not justified because (a) there was no medical evidence upon which to base a finding of the proportion in which the occupational disease was a causative factor of the death; and (b) the evidence establishes that the employee refused or willfully failed to use standard safety appliances ordered and provided for his protection and use.

■ *Notice*

As stated, the Industrial Commission found that the employee contracted pulmonary disease consisting of bronchial asthma and emphysema as a result of his exposure to dust and insect spray during the entire period of his employment at the Rush City mill from 1933 to July 12,

1957, and that the employer had due notice and knowledge of this disease which resulted in disablement commencing December 20, 1957.

The record does not support a finding of written notice to the employer either within 90 days after "disablement" as required by Minn. St. 176.664[1] or within 90 days after "the occurrence of the injury" as required by § 176.141.[2] If the finding of the commission in this regard is to be sustained, it must be on the ground that the employer had actual notice of the occupational disease, making the written notice required by these statutes unnecessary.

---

[1] Minn. St. 176.664 provides in part: "In all cases except silicosis or asbestosis unless the employer shall have actual notice of the injury any claim for occupational disease is barred unless within 90 days after disablement of an employee as defined in section 176.66, subdivision 1, notice thereof in accordance with section 176.141 shall have been given to the employer, and unless the claim is filed with the commission within the period specified in section 176.151 * * *. If disablement occurs within the last 90 days allowed by this section for filing claim with the commission, then the employee or his dependents shall be allowed a period of 90 days from the happening of such disablement to comply with the provisions of this section."

[2] Minn. St. 176.141 provides: "Unless the employer has actual knowledge of the occurrence of the injury or unless the injured worker, or a dependent or some one in behalf of either, gives written notice thereof to the employer within 14 days after the occurrence of the injury, then no compensation shall be due until such notice is given or knowledge obtained. If the notice is given or the knowledge obtained within 30 days from the occurrence of the injury, no want, failure, or inaccuracy of a notice shall be a bar to obtaining compensation unless the employer shows that he was prejudiced by such want, defect, or inaccuracy, and then only to the extent of such prejudice. If the notice is given or the knowledge obtained within 90 days, and if the employee or other beneficiary shows that his failure to give prior notice was due to his mistake, inadvertence, ignorance of fact or law, or inability, or to the fraud, misrepresentation, or deceit of the employer or his agent, then compensation may be allowed, unless the employer shows that he was prejudiced by failure to receive such notice, in which case the amount of compensation shall be reduced by such sum as fairly represents the prejudice shown. Unless knowledge is obtained or written notice given within 90 days after the occurrence of the injury no compensation shall be allowed."

In order for "actual notice" to excuse the lack of written notice, it must be possessed by the employer at some time before the expiration of the notice period. The notice period for occupational disease under § 176.664 begins to run no later than the date of disability. See, Clausen v. Minnesota Steel Co. 186 Minn. 80, 242 N. W. 397. "Disability," according to § 176.66, subd. 1, is the state of being disabled from earning full wages at the work at which the employee was last employed. See, Fink v. Cold Spring Granite Co. 262 Minn. 393, 115 N. W. (2d) 22. This test of disability is to be compared with that used for § 176.66, subd. 3.[3] A disease is "contracted" when it manifests itself so as to interfere with bodily functions to such an extent that the employee can no longer substantially perform the duties of his employment. See, Anderson v. City of Minneapolis, 258 Minn. 221, 103 N. W. (2d) 397, and Ogren v. City of Duluth, 219 Minn. 555, 18 N. W. (2d) 535.

As applied here, the notice period began no later than December 20, 1957, the time when, according to the commission, employee became temporarily totally disabled by the disease. Thus, the only relevant actual notice here is that possessed by the employer before March 20, 1958.

If the employer had knowledge of the contents of the hospital records that were available for examination on and before March 20, 1958, the requirement of actual notice of the injury within the meaning of § 176.664

---

[3] Minn. St. 176.66, subd. 3, provides: "Neither the employee nor his dependents are entitled to compensation for disability or death resulting from occupational disease, unless such disease is due to the nature of his employment as defined in section 176.011, subdivision 15, *and* was contracted therein within 12 months previous to the date of disablement; except in the case of silicosis or asbestosis, in which cases disablement of the employee must occur within three years from the date of such employee's last exposure with an employer in an employment to the nature of which the disease may have been a hazard, and except if immediately preceding the date of his disablement or death, an employee was employed on active duty with an organized *fire* or *police* department of any municipality, as a member of the Minnesota *highway* patrol, *game warden* service, or *state crime bureau,* and his disease is that of myocarditis, coronary sclerosis, pneumonia or its sequel, the disease shall be presumed to have been contracted therein within 12 months previous to the date of disablement." (Italics supplied.)

would be satisfied. It is knowledge of the disease as distinguished from knowledge of a causal relationship between the disease and the employment that is required. See, Rosvold v. Independent Consol. School Dist. No. 102, 251 Minn. 297, 87 N. W. (2d) 646. Actual knowledge has been defined, for purposes of § 176.141, as information sufficient to prompt inquiry by the employer or, at a minimum, information such as would cause a reasonable man to act in the ordinary course of human affairs. Sobczyk v. City of Duluth, 245 Minn. 569, 73 N. W. (2d) 795. If the employer or its insurer had occasion to see the references to asthma in the hospital records, they would have been given the needed notice of the existence of a job-related occupational disease.

There is no direct evidence that the employer or its insurer actually saw any of the hospital records prior to the expiration of the notice period. But, in our opinion, the Industrial Commission was justified in attributing to the employer the knowledge which an examination of these records would have imparted to it.

Manifestations of asthma are such as to be apparent to anyone making a reasonably acute observation of the person suffering from this disease. If it was a fact that the employee had been suffering from asthma for 15 years prior to the date on which his history was taken at Asbury Methodist Hospital (December 23, 1957), it seems unlikely that the supervisory personnel in the employer's small plant at Rush City would have failed to notice it. Knowledge gained by a foreman or superintendent is to be imputed to the employer. Sobczyk v. City of Duluth, *supra*.

The employee made a claim for workmen's compensation against the employer in August 1957 upon a medical theory unrelated to the present claim of occupational disease. There is no direct evidence to show that the hospital records were examined at that time by either the employer or its insurer. Even so, it is a reasonable inference that all available medical records were examined promptly by the insurer as a part of its investigation of the claim for compensation made by the employee. There is no testimony in the record by anyone representing either the employer or insurer refuting this possible inference. A notation appearing in the hospital records to the effect that an examination was made by relator insurer at a time *after* the period when actual notice of the injury would be

significant does not establish the absence of a check of these records by the employer or the insurer at some earlier time. We do not place controlling weight on the testimony adduced for the employee to the effect that an officer of the employer acknowledged that the first claim of the employee to compensation had been fully investigated when he was getting ready to leave the mill. But that testimony having been given, the absence in the record of any denial by the officer to whom the statement was attributed that he had made it and the absence of any explanation by him that the statement, if made, had a connotation different than that urged by the employee, supports the inference that the employer or its insurer acquired knowledge of the medical information of record within 90 days of December 20, 1957.

The decision which we have reached with respect to actual notice of disability makes it unnecessary to determine whether the notice of death, admittedly timely, could save the claims of the dependents for death benefits even if benefits payable because of disability resulting from the occupational disease and hospital and medical expense incurred by reason of it were lost for failure to give the statutory notice to the employer.[4]

Whatever doubts we might have as to the sufficiency of the evidence to support a finding of actual notice have been resolved in favor of the

---

[4] For a discussion of that problem see Federal Underwriters Exch. v. Brigham (Tex. Civ. App.) 184 S. W. (2d) 849; Wray v. Carolina Cotton & Woolen Mills, 205 N. C. 782, 172 S. E. 487; Beels v. Department of Labor & Industries, 178 Wash. 301, 34 P. (2d) 917; and Lambing v. Consolidation Coal Co. 161 Pa. Super. 346, 54 A. (2d) 291. Compare Nyberg v. Little Falls Black Granite Co. 202 Minn. 86, 277 N. W. 536, with Carroll v. State, 242 Minn. 70, 64 N. W. (2d) 166; Johnson v. Pillsbury Flour Mills Co. 203 Minn. 347, 281 N. W. 290; and Lewis v. Connolly Contracting Co. 196 Minn. 108, 264 N. W. 581. The following cases hold that the failure to give timely notice of an injury or occupational disease which first causes disability and then death bars claims for both disability and death benefits: Gallegos v. George A. Rutherford, Inc. 67 N. Mex. 459, 357 P. (2d) 50; Matter of Whitmyre v. I. B. M. Corp. 267 N. Y. 28, 195 N. E. 539; Price v. Burlington Refrigerator Exp. Co. 131 Neb. 657, 269 N. W. 425; Winston v. City of Richmond, 196 Va. 403, 83 S. E. (2d) 728; Buttinger v. Ely & Walker Dry Goods Co. (Mo. App.) 42 S. W. (2d) 982; and Schwarz v. Federal Shipbuilding & Dry Dock Co. 29 N. J. Super. 374, 102 A. (2d) 678.

employee in accord with the general policy of a liberal construction of provisions with respect to notice as distinguished from the statutory limitations specified for the filing of claims. Compare Beson v. Carleton College, 271 Minn. 268, 136 N. W. (2d) 82, and Anderson v. City of Minneapolis, 258 Minn. 221, 103 N. W. (2d) 397, involving time limitations for notice, with Bergstrom v. O'Brien Sheet Metal Co. 251 Minn. 32, 86 N. W. (2d) 82, involving time limitations for actions or proceedings to determine or recover compensation.

### ■ *Causal Relationship*

Recognizing the principle that a finding of causation cannot be based on mere conjecture, Honer v. Nicholson, 198 Minn. 55, 268 N. W. 852; Hiber v. City of St. Paul, 219 Minn. 87, 16 N. W. (2d) 878; Saaf v. Duluth Police Pension Relief Assn. 240 Minn. 60, 59 N. W. (2d) 883, we nevertheless find the evidence adequate to support the commission's finding of a causal relationship between the conditions of employment and occupational disease and between the occupational disease and the death of the employee.

Dr. Richard Frey, a Minneapolis internist, testifying in response to a hypothetical question which described the conditions of employee's employment, expressed this opinion:

"* * * I think beyond a reasonable doubt this type of exposure over the course of this length of time is a factor in the production of bronchial asthma and subsequent pulmonary emphysema."

Upon cross-examination, this question and answer appear:

"Q. But what you are saying is that with the asthmatic condition, whatever did cause it, the exposure to the dust in the air would be an aggravating factor?

"A. Yes, I said I would agree it would be an aggravating factor but also I did state that I felt that it was probably the etiological factor."

Corroboration of Dr. Frey's opinion is to be found in the testimony of Dr. Morris Johnson, a St. Paul internist, and Dr. J. E. Halpin, the attending physician.

With respect to the relationship between the occupational disease and the death, we note the following excerpts from the testimony of Dr. Frey:

"A. Asthmatic bronchitis will frequently lead * * * into what we call obstructive pulmonary emphysema * * *.

* * * * *

"* * * I think the pulmonary emphysema and the subsequent poor ventilation was a major factor—could serve as a major factor in his demise after the occurrence of the infarct.

* * * * *

"* * * it is my feeling that the pulmonary emphysema contributed materially to the demise in this situation."

In addition, Dr. Morris Johnson testified:

"It is my opinion, within a reasonable degree of medical certainty, that the patient * * * had an acute myocardial infarction; that the patient's chronic respiratory disease very markedly compromised his chance of recovery from this myocardial infarction * * *."

In the absence of an autopsy, the medical witnesses acknowledged the validity of the expressed opinions could not be tested with scientific certainty. Nevertheless, and notwithstanding competent medical testimony to the contrary, we think the evidence sufficient to sustain the essential findings of causation.

### ■ *Disability Benefits*

The employer and insurer were placed on notice that the petition filed was not limited to death benefits. In the petition specific reference is made to "hospital and medical expenses made necessary by said accidental injury." And it is asserted that the employee was injured on or about August 1, 1957, by an accident arising out of and in the course of his employment. In addition, respondent's exhibit 14, a letter from the employee's attorney to the employer which was received by the employer's insurer on March 8, 1961, makes it clear that a claim of total disability preceding the death was being asserted.

### ■ *Minn. St. 176.661*

The Industrial Commission awarded death benefits under the provisions of Minn. St. 176.661, which provides in part:

"Where an occupational disease is aggravated by any other disease or

infirmity, not itself compensable, or where disease or death from any other cause, not itself compensable, is aggravated, prolonged, accelerated, or contributed to by an occupational disease, the compensation payable is to be reduced and limited to such proportion only of the compensation that would be payable if the occupational disease were the sole cause of disease or death, as such occupational disease, as a causative factor, bears to all the causes of such disease or death. No compensation shall be payable for occupational disease where the employee refuses or wilfully fails to use standard safety appliances, ordered and provided for his protection and use, and approved by the commission, or who wilfully refuses to obey reasonable rules prescribed, printed and posted by the commission for the conduct of the work or to perform a statutory duty."

Relators contend that the conclusion of the Industrial Commission that 50 percent of the cause of death was work-related is purely speculative in this situation where relators' medical witnesses declared that there was no causal relationship between an occupational disease and the death and where employee's medical witnesses acknowledged that the primary cause of death was a heart condition not related to the employment. It is true that the medical witnesses presented in behalf of the employee did not express the relationship between the causative factors of death in terms of percentage.

In situations where the Industrial Commission is called upon to determine the proportion in which two or more possible causes contributed to disability or death, the opinions of competent experts on the question expressed in terms of percentages should ordinarily be elicited. Recent cases illustrative of this problem are Haverland v. Twin City Milk Producers Assn. 273 Minn. 481, 142 N. W. (2d) 274, and Hoyt v. Twin City Bldg. & Improvement Co. 274 Minn. 71, 142 N. W. (2d) 626. But, informed by the testimony of this employee's need for an adequate supply of oxygen and the loss of the lungs' capacity to deliver oxygen which is a result of pulmonary emphysema, we think the commission's allocation of causation to be within reasonable limits under the circumstances of this particular case. See, Hunt v. Builders Iron Foundry, 76 R. I. 152, 68 A. (2d) 96.

We do not agree with relators that the evidence was such as to compel

a finding that the employee refused or willfully failed to use standard safety appliances ordered and provided for his use and approved by the commission within the meaning of the statute.

The decision of the Industrial Commission is affirmed and the sum of $250 is allowed to the attorney for respondent for legal services incident to this review.

Affirmed.

OTIS, JUSTICE (dissenting).

I do not agree that a commission composed of laymen has sufficient expertise to determine the extent to which work-related causes led to this employee's death. I would remand for further medical testimony on the question.