## EVA ROBERTS AND OTHERS v. METROPOLITAN LIFE INSURANCE COMPANY.[1]

May 28, 1943.

No. 33,484.

[1]Reported in 9 N. W. (2d) 730.

*W. L. Sholes,* for appellants.

*Snyder, Gale & Richards,* for respondent.

JULIUS J. OLSON, JUSTICE.

This action was brought by the daughters of one George A. Roberts as beneficiaries of a group policy issued by defendant upon the life of their father. Under the terms of the policy defendant agreed to pay to the beneficiaries $7,500 if the death of the insured should occur while he was an employe of the Detroit Fire & Marine Insurance Company. It is conceded that Roberts came to his death by suicide on April 26, 1935, at St. Paul.

Early in the trial counsel stipulated "That the sole issue between the parties herein is as to whether or not one George A. Roberts [the insured] at the time of his death was an employee of the Detroit Fire & Marine Insurance Company."

At the conclusion of the trial counsel for each party moved for a directed verdict. The court denied both motions, saying, "I think I will let it [the case] go to the jury and determine it later."

There was a verdict for plaintiffs. That the jury had trouble in its deliberations is evidenced by the fact that it took more than 12 hours to reach a decision, and only 10 members joined in the verdict.

Thereafter, upon defendant's alternative motion for judgment or a new trial, the court granted the motion for judgment. Plaintiffs appeal from the judgment.

The only question here is whether there is evidence in the case presenting a fact issue. The trial court in its memorandum granting the motion for judgment was of the view that, while plaintiffs' counsel had presented "ingenious and clever argument" for his clients, he had in reality raised nothing but "possibilities and inferences as to what might have happened had the said Roberts

lived insofar as reëmployment or temporary. discharge" was concerned. But, continued the court, "in this case we are dealing with cold facts"; and, since "there was no question but what said Roberts was discharged by one having authority the day previous to his death," therefore, "at the time of his death he was not an employee of the Detroit Fire & Marine. Consequently his beneficiaries are not entitled to recover."

Mr. Roberts was nearly 77 years of age when he died a suicide's death. Over a period of 35 years he had been a trusted employe of Detroit Fire & Marine Insurance Company as its state agent. He was paid on a salary basis with expense allowance. His home and office were in St. Paul. Not only was he a trusted and confidential employe, but he was likewise a man capable of winning and holding friends and acquaintances of high type and standing. However, under the veneer of respectability and trustworthiness, there existed another person wholly different from the man with whom the employer dealt and with whom his associates came in contact. By his own admissions, for a period of at least five to seven years he had perfected and put into lucrative practice a procedure to get what appeared to be a safe way to steal from his employer. His method was to report a fire loss to the company by forging the assured's name to a report and proof of loss. This, as its state agent, he would recommend for settlement, certifying that he had made "an examination of the circumstances and origin of said fire" and that he believed the same to be "without fraud on the part of the assured." He would then draw a draft on the company for such sum, payable to the supposed assured, cash it by forging the assured's name thereto, and then appropriate the money to his own use.

On or prior to April 25, 1935, information had reached the Detroit office of his employer that there were irregularities that needed attention. On that date Mr. Raymond Waldron, a vice president of the company in full charge of the "midwestern territory," which included all of Minnesota, and having full power of hiring and discharging men under him, came to St. Paul for the purpose of investigating the facts. Mr. Roberts was out of town that day but

finally came to the company's office at about six o'clock. As to what then took place, Mr. Waldron testified:

"A. I said, 'Mr. Roberts, we have tried all day to get you, long distance 'phone. We wanted you to come into St. Paul because I have found what looks to be like irregularities in some of your loss adjustment work.' And I said, 'Mr. Roberts, is it true that you have adjusted and paid a lot of crooked or fictitious losses?' He lowered his head, he said, 'Yes, it is true.' I was flabbergasted, because there is no man that I ever knew—

"The Court: Just say what happened.

"The Witness: 'Well,' I said, 'Mr. Roberts, I would like to make an examination. I have here about 16 cases that appear to be irregular, and I would like to go over each one of them with you.' I said, 'Will you submit to an examination?' He said, 'I will.' Well, I had made arrangements earlier in the day with the court reporter to have her available even after six o'clock. So Mr. Roberts and I got in the car * * * and went out to the home of the court reporter, * * * Miss Eva Greer."

There Waldron questioned Roberts at length about each of the 16 cases involving discovered irregularities on Roberts' part. He admitted all but two to be fraudulent, as having no foundation in fact and wholly fictitious. A record of some 20 pages of typewritten matter was taken by Miss Greer in question-and-answer form, each of the 16 cases being considered separately. Miss Greer took the statement in shorthand and transcribed it verbatim that evening. Toward the end of the examination this appears:

"Q. Mr. Roberts, I want to repeat what I said to you a while ago, that *your services are no longer required and that your employment with the Detroit Fire & Marine Insurance Company ceases today, that you are no longer the State Agent, and that all connection as an employe of the Detroit Fire & Marine Insurance Company is terminated right now; you understand that?*

"A. *I do.*

"Q. When these questions and answers that have been recorded

here are transcribed in typewritten form, will you be willing to sign them?

"A. I will.

"Q. One thing more before we terminate this interrogation: At the home office in Detroit we are going through the records in try-' ing to pick out the fraudulent losses as best we can, and I may have some more cases to submit to you, that is, to ascertain whether they are genuine or false. Will you submit to further questioning?

"A. Certainly." (Italics supplied.)

Mr. Waldron testified at the trial in behalf of defendant, although he "had absolutely nothing to do with the life insurance" problem. During the conversations he had with Roberts nothing whatever was said about life insurance, as this feature was entirely foreign to Waldron's employment and interests. While subjected to severe cross-examination, we find nothing in his testimony in the nature of inconsistencies going to the merits of the only controversy here involved.

Miss Greer likewise was a witness. That she was a competent, honest, and capable court reporter plaintiffs' counsel freely admits. He said during his cross-examination of her: "I have great confidence in your ability as a court reporter. I frankly admit that. And I haven't any doubt about the accuracy of what you say in your certification" appearing at the end of the typewritten statement. She testified that "from the time the statement was taken [on the evening of April 25] until it was concluded I took down everything and I transcribed everything. Q. Everything that was said? A. Yes." The arrangement made that evening was that Waldron and Roberts were to meet the next morning at 11 o'clock at the St. Paul Hotel, at which time Roberts said "he would be very glad to sign the statement and give them any—answer any other questions they wished to ask him. Q. To ascertain the shortages? A. Yes." With respect to the time when the employment was to end, Miss Greer testified: "He [Waldron] told him [Roberts] that his employment had ceased. Q. He told him that

in this transcript? A. Yes, it ceased from the moment the statement was taken."

It was understood, so she said, that the purpose of meeting the following morning was to give Mr. Roberts an opportunity of correcting the statement if there was anything in it that he found to be incorrect. There is, however, no suggestion that the statement from which we have quoted was not freely given or that any coercion, oppression, or other improper method was employed in its procurement. Mr. Roberts did not meet with Mr. Waldron and Miss Greer the next morning, and the last time he was seen alive was at nine o'clock on the morning of April 26, when he was seen sitting in his car on Jefferson avenue in St. Paul. Waldron and others tried to reach him but failed. Not until that evening did his son-in-law discover his death, when the coroner informed him that he considered Mr. Roberts had died some six or seven hours earlier.

The testimony quoted comes from unsullied, unselfish, and wholly unimpeached sources. It is positive, fair, and reasonable. We find nothing in it that would justify a trier of fact to reject what the witnesses said. Thus the rule of O'Leary v. Wangensteen, 175 Minn. 368, 370, 371, 221 N. W. 430, 431, obviously applies: "The court or jury cannot disregard the positive testimony of an unimpeached witness unless and until its improbability or inconsistency furnishes a reasonable ground for so doing." The present case is wholly unlike Weinstein v. Schwartz, 204 Minn. 189, 190, 283 N. W. 127, in which we held that, "even though the testimony of a witness is without extraneous contradiction, it need not be believed by a jury where other circumstances in evidence are such as to discredit it." In that case, referring to the O'Leary case, we considered the rule there laid down a "venerable" one.

"But," we said, "this case is outside that rule. The jury might reasonably have attributed defendant's obvious willingness to be worsted to a desire that his mother-in-law, plaintiff, collect damages from his insurer. That was coupled with what the jury might well

have believed was a gross and wilful testimonial exaggeration of her physical impairment by plaintiff herself."

■ Plaintiffs claim that they should "have the benefit of a presumption that Roberts having been employed at least until the evening before his death, his employment continued until the time of his death, and the jury were entitled to weigh this presumption with all the evidence in the case." And again, at p. 41 of their brief, they say that they are entitled to this presumption because it "has *independent evidentiary value, and does not disappear when contrary evidence is introduced, but must be considered by the trier of the facts."* Therefore, so they reason, the jury "was entitled to weigh" the presumption of his continued employment thereafter against the unimpeached evidence to the contrary. They even assert (see p. 43 appellants' brief) that *"the presumption of continued employment was in and of itself an inference to be weighed by the jury."* (Italics supplied.) Obviously, what plaintiffs seek is the elimination of our holding in Ryan v. Metropolitan L. Ins. Co. 206 Minn. 562, 289 N. W. 557, to the effect that "neither that presumption [against suicide], nor any other in the category of rebuttable presumptions, should be given to the jury in a civil case." Duff v. Bemidji Motor Service Co. 210 Minn. 456, 462, 299 N. W. 196, 199. Plaintiffs quote (206 Minn. 570, 289 N. W. 561) from that case, as follows:

"In all this we do not mean to say that in a proper case it would be error for a judge to instruct, in his discretion, that in one possible condition a presumption would control. To illustrate, the evidence of suicide may consist wholly of testimony which the jury may discredit. In such a case it would be proper to charge them that, if they did reject all such evidence as incredible, it would be their duty to find the death accidental."

But counsel overlooks or ignores the fact that here we have no "incredible evidence," no doubtful testimony of a type that might be classified as (204 Minn. 190, 283 N. W. 128) "a gross and wilful

testimonial exaggeration" of any of the facts to which the witnesses Waldron and Greer testified.

■ Plaintiffs further claim that "the jury could reasonably find that employer had the strongest motives for keeping Roberts on the job; had no intention to discharge him permanently prior to the 11 o'clock meeting, if at all, but at most intended to frighten, discipline, and restrain his actions." The trial judge properly characterized this as something founded upon mere "possibilities and inferences as to what might have happened" if Roberts had lived, referring to counsel's argument that his reëmployment was in the mind of Mr. Waldron, or that this might have been only a temporary discharge. To permit the jury thus to speculate upon mere possibilities is to destroy the effect of credible evidence, free from doubt as to what was intended to be operative forthwith, *i. e.*, "that all connection as an employee" of the company "is terminated right now; you understand that?" to which Roberts answered, "I do."

Roberts had been found to be, upon his own admissions, an untrustworthy and faithless servant. His prior reputation for trustworthiness was irretrievably gone. There were compelling reasons for an immediate and final severance of the employer-employe relationship. Waldron's testimony, fortified by that of Miss Greer and Roberts' confession of guilt, cannot be cast aside upon such flimsy and farfetched theories. To hold with plaintiffs on this score is impossible of judicial sanction. And here, too, we have the irrefutable proof of guilt supplied by Mr. Roberts himself—a complete severance, through his suicide, from his employer, his friends, his business associates, and his family, in fact from all earthly connections.

Since the verdict is without support in the evidence upon the only issue in the case, it follows that the judgment of the trial court granted notwithstanding the verdict must be, and it is, affirmed.

Affirmed.