## JEROME G. ANDERSON v. CITY OF MINNEAPOLIS.

103 N. W. (2d) 397.

June 3, 1960—No. 37,949.

*Charles A. Sawyer,* City Attorney, and *G. V. Johnson,* Assistant City Attorney, for relator.

*John R. Parker,* for respondent.

KNUTSON, JUSTICE.

Certiorari to review a decision of the Industrial Commission awarding compensation to an employee for disability due to an occupational disease.

Employee, a man 52 years of age, began working for the Minneapolis fire department in 1936. Except for a period from June 30, 1943, to

September 1945, when he was in the military service, he continued in this employment until January 10, 1957. During this time he did the usual work of a fireman. He customarily worked a shift of 24 hours and then was off 24 hours. He frequently did other work during the time that he was off duty, the last of which consisted of working in a grocery store. During most of the time of his employment as a fireman, he was a "nozzle man," and, as such, it was his duty to get the hose off the rig and to the site of the fire as quickly as possible. The work required strenuous effort on his part and often was done under much tension and stress.

Early in 1954 employee was examined at the University of Minnesota on an experimental basis, and it was then found that he had some heart damage. On advice of the doctors at the university, he saw his personal physician and was examined, including electrocardiograms. The doctor diagnosed posterior myocardial damage and the existence of coronary sclerosis. No medication was prescribed, but the doctor advised employee of his condition and suggested that he should cease his employment as a fireman. The doctor continued to so advise him in subsequent examinations. Employee continued, however, with his work without informing his employer of his condition. His explanation for not informing his employer was: "I knew darn well they would put me off duty." He did inform two fellow employees, who, on occasions when the work became too strenuous, would help him perform his work. During this time he experienced some shortness of breath and some pains in his chest. In October 1956 his condition had become so serious that he gave up his employment as a grocery clerk. In January 1957 he informed his captain of his condition. He was then examined by his employer's doctor and his employment terminated. That was the first notice that the employer had of his condition.

■ The main question presented here is whether the claim for compensation is barred by M. S. A. 176.66, subd. 3, which reads:

"Neither the employee nor his dependents are entitled to compensation for disability or death resulting from occupational disease, *unless such disease* is due to the nature of his employment as defined in section 176.011, subdivision 15, and *was contracted therein within 12*

*months previous to the date of disablement;* except in the case of silicosis or asbestosis, in which cases disablement of the employee must occur within three years from the date of such employee's last exposure with an employer in an employment to the nature of which the disease may have been a hazard, and except *if immediately preceding the date of his disablement* or death, *an employee was employed on active duty with an organized fire* or police *department of any municipality,* or as a member of the Minnesota highway patrol, *and his disease is that of* myocarditis, *coronary sclerosis,* pneumonia or its sequel, *the disease shall be presumed to have been contracted therein within 12 months previous to the date of disablement."* (Italics supplied.)

Section 176.66, subd. 3, must be read with § 176.011, subd. 15,[1] and § 176.66, subd. 1, which reads:

---

[1] "'Occupational disease' means a disease arising out of and in the course of employment peculiar to the occupation in which the employee is engaged and due to causes in excess of the hazards ordinary of employment and shall include undulant fever. Ordinary diseases of life to which the general public is equally exposed outside of employment are not compensable, except where such diseases follow as an incident of an occupational disease, or where the exposure peculiar to the occupation makes such disease an occupational disease hazard. A disease arises out of the employment only if there be a direct causal connection between the conditions under which the work is performed and if the occupational disease follows as a natural incident of the work as a result of the exposure occasioned by the nature of the employment. An employer is not liable for compensation for any occupational disease which cannot be traced to the employment as a direct and proximate cause and is not recognized as a hazard characteristic of and peculiar to the trade, occupation, process, or employment or which results from a hazard to which the workman would have been equally exposed outside of the employment. If immediately preceding the date of his disablement or death, an employee was employed on active duty with an organized fire or police department of any municipality, or as a member of the Minnesota highway patrol, and his disease is that of myocarditis, coronary sclerosis, pneumonia or its sequel, and at the time of his employment such employee was given a thorough physical examination by a licensed doctor of medicine, and a written report thereof has been made and filed with such organized fire or police department or with the Minnesota highway patrol which examination and

"The disablement of an employee resulting from an occupational disease, except where specifically otherwise provided, is to be treated as the happening of an accident within the meaning of the workmen's compensation law and the procedure and practice provided applies to all proceedings under this section, except where specifically otherwise provided herein. When used in this section, 'disability' means the state of being disabled from earning full wages at the work at which the employee was last employed and 'disablement' means the act of becoming so disabled."

It is obvious that the legislature intended a distinction to be drawn between contracting the disease and "disablement."[2] The term "disablement" is defined by the legislature and presents no serious difficulty in its application. The term "contracted," however, when used with reference to occupational diseases such as sclerosis, silicosis, berylliosis, tuberculosis, or other diseases which are of a progressive nature and often require the lapse of much time from their inception until they reach a stage where they are disabling or where it can be said that they have been legally contracted within the meaning of the Workmen's Compensation Act, has given rise to much difficulty. This difficulty was recognized in Kellerman v. City of St. Paul, 211 Minn. 351, 353, 1 N. W. (2d) 378, 379, where we said:

"* * * All the expert witnesses agreed that many years elapse between the inception of the sclerotic condition and resultant death. It would therefore be highly improbable for a fireman to die or become otherwise disabled within one year after the origin of sclerosis in the coronary arteries. Thus the anomalous situation is presented that, while one subsection of the statute makes coronary sclerosis an occupational disease for firemen, another renders it impossible for firemen to receive its benefits."

In attempting to give effect to both subds. 1 and 3 of § 176.66, the

---

report negatived any evidence of myocarditis, coronary sclerosis, pneumonia or its sequel, the disease is presumptively an occupational disease and shall be presumed to have been due to the nature of his employment."

[2] Ogren v. City of Duluth, 219 Minn. 555, 18 N. W. (2d) 535.

rule evolved by our decisions is that an occupational disease such as sclerosis,[3] silicosis,[4] berylliosis,[5] or tuberculosis[6] is "contracted" within the meaning of the statute when it first manifests itself so as to interfere with bodily functions.

The difficulty in applying this rule arises with respect to the degree of interference with bodily functions necessary before it can be said that the disease is contracted. In other words, is every symptom such as a shortness of breath or a temporary slight chest pain enough to put an employee on warning of the existence of the disease so that he is compelled to discontinue his employment and seek compensation at that point—or within 12 months—or be forever barred thereafter? On the other hand, may an employee discover the existence of a sclerotic or silicotic condition and continue with his employment, without disclosing the condition to his employer, until he is completely disabled or until he dies as a result of it? Rights of both employee and employer are involved in the proper solution of this problem.

It must be admitted that in dealing with many of these occupational diseases no one can say exactly when the disease reaches the stage where even all medical witnesses would agree that it has been legally contracted within the purview of workmen's compensation acts. In the very nature of things, the aging process which goes on in all of us takes its toll of the vigor of youth. From the medical testimony it probably can be said that some sclerosis exists in everyone as they advance in age. In some the process proceeds faster than in others. Some have more stamina than others and might be able to continue with ordinary daily activities longer after the process of developing these occupational diseases has commenced. Symptoms such as shortness of breath might be said to appear in most people as they advance in age. It is thus apparent

---

[3]Kellerman v. City of St. Paul, 211 Minn. 351, 1 N. W. (2d) 378; see, also, Ogren v. City of Duluth, 219 Minn. 555, 18 N. W. (2d) 535.

[4]Yaeger v. Delano Granite Works, 236 Minn. 128, 52 N. W. (2d) 116.

[5]Corcoran v. P. G. Corcoran Co. Inc. 245 Minn. 258, 71 N. W. (2d) 787.

[6]Gray v. City of St. Paul, 250 Minn. 220, 84 N. W. (2d) 606; Kalmes v. Kahler Corp. 258 Minn. 105, 103 N. W. (2d) 203; see, also, Kress v. Minneapolis-Moline Co. 258 Minn. 1, 102 N. W. (2d) 497.

that it is not satisfactory to equate the first symptoms of an occupational disease with legal contraction of the disease for the purpose of determining when the limitation provided in § 176.66, subd. 3, shall commence to run. Neither is it satisfactory to equate contraction with disability, as that term is used in subd. 1, for to do so renders the limitation period provided by the legislature completely nugatory. It would seem that, in order to accord compensation acts the liberal construction that they are entitled to,[7] we must go one step farther than our present definition and hold that, within the meaning of § 176.66, subd. 3, a progressive occupational disease such as sclerosis, silicosis, berylliosis, and tuberculosis is contracted when it manifests itself so as to interfere with bodily functions to such an extent that the employee can no longer substantially perform the duties of his employment. While we realize that this definition comes perilously close to repealing the limitation provided by § 176.66, subd. 3, it seems necessary to so hold if we are not to deprive many employees of their right to compensation simply because they did not make a claim for it when the first symptoms of an occupational disease were discovered. Rather than to do that, it seems to us better to leave it to the legislature to provide a more definite definition than we have now.

To give effect to workmen's compensation benefits in the field of occupational diseases, we can hardly hold that the disease has been *contracted,* so as to start the period of limitation running, until the disease has reached a stage where it is, or within 12 months will be, compensable. To do otherwise is to place such employee in the unenviable position where he must discontinue his work within 12 months of discovery of the first symptoms of such disease or run the risk of being denied compensation because the statute of limitations has run. We do not think that the legislature could have intended such result. After all, the main criterion in determining whether an occupational disease is compensable ought to be the causal relationship between the disease and the employment. If the disease results from the employment, it should be compensable no matter when it had its inception.

---

[7]Kellerman v. City of St. Paul, 211 Minn. 351, 1 N. W. (2d) 378.

As applied to the facts of this case, it is admitted that the employee knew he had a sclerotic condition in 1954. He was then advised by his doctor to seek less strenuous employment. However, he did continue with his work, and, with the exception of a few times when fellow employees helped him, he did perform all the duties required of him. Until 1956, when the disease had progressed to a point where he felt compelled to give up his work in the grocery store, he was performing substantially all the functions he had done prior thereto. Under these circumstances, the commission was justified in finding that the disease was not contracted more than 12 months prior to his disablement.

■ The only other question of any consequence is whether the commission's finding of causal relationship between the disease and the employment is sustained by the evidence. Here, as in Kellerman v. City of St. Paul, 211 Minn. 351, 1 N. W. (2d) 378, the medical experts disagreed as to whether the work of a fireman hastens the development of sclerosis. As we said in the Kellerman case, under these circumstances a fact issue was presented, and the determination of that fact issue will not be disturbed on appeal where there is competent evidence to sustain it.

The commission did, however, improperly ascribe evidentiary status to the presumption that in the case of a fireman sclerosis is an occupational disease. In discussing the presumption, the commission said:

"* * * The presumption provides the basis for a permissible inference, and it, of course, may be rebutted by the introduction of substantial proof to the contrary."

The proper use of a presumption is discussed in Ogren v. City of Duluth, 219 Minn. 555, 563, 18 N. W. (2d) 535, 539, where we said:

"The presumption in question was a mere rule of evidence; it created a rebuttable presumption of causation under the circumstances mentioned that a particular occupational disease resulted from the corresponding industrial process. * * *

* * * * *

"* * * It is well settled that a presumption is not evidence, but is

rather a rule of law dictating decision on unopposed facts and shifting the burden of going forward with the evidence. Ryan v. Metropolitan L. Ins. Co. 206 Minn. 562, 289 N. W. 557. The presumption obtains until substantial proof to the contrary is introduced. Then it ceases and vanishes from the case. The case is then to be decided by the trier of fact the same as if the presumption had never existed."

To permit an inference to be drawn from a presumption is to give the presumption evidentiary status. It is not evidence but a rule which controls decision on unopposed facts in the absence of evidence to rebut it. However, here the evidence clearly permits an inference that sclerosis was an occupational disease, so we believe that the erroneous use of the presumption as the basis for such inference has done no harm. Nothing would be accomplished by remanding the case to the commission in order that it might draw this inference from the evidence rather than from the presumption.

■ Employer also raises the question as to the sufficiency of notice as required by § 176.664. We think that this question is foreclosed by Ogren v. City of Duluth, *supra*. Written notice under the statute is not necessary where the employer has actual notice. When the employee informed the employer of the existence of the occupational disease and was examined by him in January 1957, the employer had actual notice.

Affirmed.