## GRACE A. SCHWARTZ v. CITY OF DULUTH AND ANOTHER.

119 N. W. (2d) 822.

February 8, 1963—No. 38,699.

*Lewis, Hammer, Heaney, Weyl & Halverson,* for relators.
*Harry T. Lathrop,* for respondent.

MURPHY, JUSTICE.

Certiorari to review a decision of the Industrial Commission awarding compensation to dependent of a deceased employee.

From the record it appears that George Schwartz, deceased em-

ployee, became a member of the Duluth Fire Department in 1942 when he was 32 years of age. He was initially classified as a fire fighter but was later promoted to the position of fire fighter chauffeur. In the performance of his duties he was required to maintain and operate a 1,000-gallon water pumper and to know the location of hydrants. In responding to an alarm, his duties as chauffeur required him to stop at the hydrant, let the other firemen off, and then continue to the fire, laying the hose from the hydrant to the scene of the fire. On some occasions he would be required to lay additional lines of hose and check the pressure and the operation of the equipment. The pumper had 1,500 feet of 2½-inch hose plus an additional footage of 1½-inch hose. In his work he was exposed to the usual hazards of smoke and heat and subject to the usual emotional strains and stresses experienced by firemen. When not actually fighting fires, his occupation was more or less sedentary, although there was some physical exertion connected with training programs. His work schedule was on the basis of three 24-hour shifts each week with one shift off every week. While on duty it was the custom for the firemen to retire at 9 p. m. or later to dormitories at the fire station. In each dormitory there was an alarm bell which would sound whenever a fire was reported. When the bell would ring at night, the firemen were required to arise, get into working gear, slide down a pole which gives quick access to the main floor, and take assigned positions on the various fire trucks. When the fire was in a different district, they would be taken off alert and permitted to return to their beds. The record indicates that the fire alarm in Duluth rings about 1,200 to 1,600 times a year and averages about 3 or 4 times each day, evenly distributed throughout the day and night hours. In addition to his work as a fireman, the decedent held a part-time job as a salesman and repairman in a local marine supply establishment.

The decedent worked on October 25, 1957, after which he had 2 days off and then began his annual vacation. On November 1 he and a friend, who also worked for the fire department, left Duluth for a duck and pheasant hunting trip. While they were hunting on November 3 they separated. The decedent stayed in a duck blind

while his friend hunted some distance away. After an interval of about 1 hour, his friend heard no reports of shooting from the position where the decedent was stationed, so he returned to the blind and found that the decedent had died.

All of the medical evidence, which includes an autopsy report, clearly establishes that the decedent at the time of his death suffered from an extreme coronary sclerosis.[1] Medical reports of the decedent's physical examination, which was a prerequisite to his being hired, indicated that he was "strong and robust" and that his heart was sound and he was "in good health and of sound physical constitution." A later health examination for the fire department in 1953 indicated that the decedent's heart was normal.

It is the contention of the relators that the death was caused by exertion due to the hunting trip and unrelated to his employment. After hearing the evidence, including medical testimony, the referee agreed. On appeal the commission took a contrary view and determined that the fatal attack resulted from an occupational disease within the purview of Minn. St. 176.011, subd. 15.[2]

1. In the course of the hearing before the referee there was a great deal of medical testimony bearing on the issue of whether cor-

---

[1]The autopsy report states: "Extreme coronary sclerosis and atheromatosis with marked narrowing of both coronary arteries. Focal thrombosis of the rest lumen of the right artery. * * * Cause of death is the result of extensive coronary sclerosis with terminal thrombosis of the rest lumen of the right coronary artery."

[2]Minn. St. 176.011, subd. 15, provides: "* * * If immediately preceding the date of his disablement or death, an employee was employed on active duty with an organized fire or police department of any municipality, or as a member of the Minnesota highway patrol, and his disease is that of myocarditis, coronary sclerosis, pneumonia or its sequel, and at the time of his employment such employee was given a thorough physical examination by a licensed doctor of medicine, and a written report thereof has been made and filed with such organized fire or police department or with the Minnesota highway patrol which examination and report negatived any evidence of myocarditis, coronary sclerosis, pneumonia or its sequel, the disease is presumptively an occupational disease and shall be presumed to have been due to the nature of his employment."

onary sclerosis could in fact be an occupational disease. The expert who testified in behalf of the city stated that coronary sclerosis develops in people of all walks of life regardless of occupation and that it cannot be said that the particular hazards or conditions involved in the work of a fireman would give rise to that disability. There was medical testimony in behalf of the decedent, however, that while there is uncertainty as to all of the factors which cause this condition it is known that it develops slowly over a long period of time. There are elements of emotional and physical stress in the work of a fireman which are conducive to the development of the condition. The decedent's medical experts were of the opinion that the extreme and hurried efforts involved in answering fire alarms, the climbing of ladders, the inhalation of fumes and smoke, the ever-present risks and uncertainties, and the lack of uninterrupted rest are all conditions conducive to development of the disease.

The issues thus raised by the relators have been previously discussed in decisions of this court and require no further elaboration. The subject of heart conditions as an occupational disease of firemen is discussed in Ogren v. City of Duluth, 219 Minn. 555, 18 N. W. (2d) 535; Kellerman v. City of St. Paul, 211 Minn. 351, 1 N. W. (2d) 378; and Anderson v. City of Minneapolis, 258 Minn. 221, 103 N. W. (2d) 397. The legislature by enactment of § 176.011, subd. 15, has recognized that coronary sclerosis may be an occupational disease. The statute says that " 'Occupational disease' means a disease arising out of and in the course of employment peculiar to the occupation in which the employee is engaged and due to causes in excess of the hazards ordinary of employment" except "[o]rdinary diseases of life to which the general public is equally exposed outside of employment * * *, except where such diseases follow as an incident of an occupational disease, or where the exposure peculiar to the occupation makes such disease an occupational disease hazard." The statute further goes on to provide that a disease arises out of employment only "if there be a direct causal connection between the conditions under which the work is performed and if the occupational disease follows as a natural incident of the work as a result of the ex-

posure occasioned by the nature of the employment." It is our view that Anderson v. City of Minneapolis, *supra*, is in point and controlling, along with the Kellerman case. In the Anderson case the employee was a fireman for the city of Minneapolis for a period of more than 20 years except for a 2-year stint in military service. Like the decedent in the case before us, Anderson held a part-time job and worked 24-hour alternate shifts. The Anderson case differs in that there the employee discovered his condition 3 years before his disablement and at the time of hearing was still alive. In the Kellerman case the fireman died of coronary sclerosis during an attack suffered while engaged in the performance of his duties. In the Anderson case we said (258 Minn. 227, 103 N. W. [2d] 401):

"The only other question of any consequence is whether the commission's finding of causal relationship between the disease and the employment is sustained by the evidence. Here, as in Kellerman v. City of St. Paul, 211 Minn. 351, 1 N. W. (2d) 378, the medical experts disagreed as to whether the work of a fireman hastens the development of sclerosis. As we said in the Kellerman case, under these circumstances a fact issue was presented, and the determination of that fact issue will not be disturbed on appeal where there is competent evidence to sustain it."

2. The relators press the claim that the legal cause of death was the coronary thrombosis resulting from the exertion of hunting and that there is no causal connection between the coronary thrombosis and whatever disability he may have sustained by reason of his employment as a fireman. We have recognized that causal connection exists if the employment, by reason of its nature, obligations, or incidents, may reasonably be found to be the source of the injury-producing hazard. "By 'causal connection' is meant not proximate cause as that term is used in the law of negligence, but cause in the sense that the accident had its origin in the hazards to which the employment exposed the employe while doing his work." Barlau v. Minneapolis-Moline Power Implement Co. 214 Minn. 564, 578, 9 N. W. (2d) 6, 13. In Nelson v. City of St. Paul, 249 Minn. 53, 55, 81 N. W. (2d) 272, 275, we said:

"* * * The causal connection of source is supplied if the employment exposes the employee to a hazard which originates on the premises as a part of the working environment, or if the employment, as a part of the working environment, peculiarly exposes the employee to an external hazard whereby he is subjected to a different and a greater risk than if he had been pursuing his ordinary personal affairs. In other words, if the injury has its origin with a hazard or risk connected with the employment, and flows therefrom as a natural incident of the exposure occasioned by the nature of the work, it arises out of the employment."

See, also, Rosvold v. Independent Consol. School Dist. No. 102, 251 Minn. 297, 87 N. W. (2d) 646; Golob v. Buckingham Hotel, 244 Minn. 301, 69 N. W. (2d) 636; Niess v. Superior Packing Co. 249 Minn. 263, 81 N. W. (2d) 773; Anderson v. Armour & Co. 257 Minn. 281, 101 N. W. (2d) 435.

It is unnecessary here to go beyond referring to the rule which has been so frequently stated: In determining whether the evidence sufficiently supports the finding of causal connection, the question is not whether we would have made the same finding were we sitting as the factfinder but whether the evidence is such that it permits an inference to be drawn from the accepted facts to warrant the findings.

Here there is complete agreement between medical experts that the thrombosis which terminated the decedent's life would not have resulted had it not been for the severe underlying sclerosis. This condition had developed to the point where the decedent's life hung by a thread. He could have expired at any time. The autopsy disclosed that the lumen of the right coronary artery was reduced to less than one-tenth of its previous diameter and that in multiple sections of the left coronary artery the lumen was "extremely narrowed by extensive atherous formation." The thickening or narrowing of the inner arterial walls had reached a point where at any time a clot or thrombus might block the flow of blood, causing death. We agree that there was evidence from which the commission could find that the thrombus and

the coronary sclerosis were so interrelated as to be one and the same work-related injury within the purview of the statute.

Respondent is allowed $250 attorney's fees.

Affirmed.

MR. JUSTICE SHERAN, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.