SYLVIA JENSEN v. CITY OF DULUTH AND ANOTHER.

130 N. W. (2d) 515.

September 4, 1964—No. 39,119.

*M. J. McKeon* and *McGuire & McGuire,* for relator.

*John J. Killen, Jr.,* and *Reavill, Neimeyer, Johnson & Killen,* for respondents.

NELSON, JUSTICE.

Certiorari to review a decision of the Industrial Commission denying compensation to dependents of a deceased employee.

The petition was filed by Sylvia Jensen, widow of George F. Jensen, for herself and a dependent child. Mr. Jensen had been employed in the fire department of the city of Duluth, Minnesota, since 1917. He had been a firefighter during all of those years, working 24 hours on and 24 hours off. It is claimed by petitioner that the mere going to work made him tense and that he was always under a great deal of apprehension, stress, and strain. The fire bell would ring in Mr. Jensen's station regardless of where the fire might be, and the firemen were always moving fast and were in the midst of a great deal of excitement. The decedent, in the course of his employment, would have to enter the buildings first, do rescue work, ventilate the building, and help in general firefighting. This work caused him to be under strain and exposed him to smoke. He did all of these things during his employment until August 1955, a period of service of nearly 40 years.

An autopsy was performed following Mr. Jensen's death on November 17, 1955, which, as far as relevant, gave as a final diagnosis:

"II.   Generalized arteriosclerosis

   "(A)   Arteriosclerosis * * * of the basal arteries of the brain * * *.

   "(B)   Coronary sclerosis * * *.

   "(C)   Arteriosclerosis * * * of the aorta * * *.

   "(D)   Arteriosclerosis * * * of both kidneys."

It would appear that the main question presented here is whether the claim for compensation is barred by Minn. St. 176.66, subd. 3, which reads:

"Neither the employee nor his dependents are entitled to compensa-

tion for disability or death resulting from occupational disease, unless such disease is due to the nature of his employment as defined in section 176.011, subdivision 15, and was contracted therein within 12 months previous to the date of disablement; except in the case of silicosis or asbestosis, in which cases disablement of the employee must occur within three years from the date of such employee's last exposure with an employer in an employment to the nature of which the disease may have been a hazard, and except if immediately preceding the date of his disablement or death, an employee was employed on active duty with an organized *fire * * * department of any municipality, * * ** and his disease is that of *myocarditis, coronary sclerosis, pneumonia or its sequel,* the disease shall be presumed to have been contracted therein within 12 months previous to the date of disablement." (Italics supplied.)

We are required in the instant case to read the foregoing statute with Minn. St. 176.011, subd. 15, which reads:

" 'Occupational disease' means a disease arising out of and in the course of employment peculiar to the occupation in which the employee is engaged and due to causes in excess of the hazards ordinary of employment and shall include undulant fever. Ordinary diseases of life to which the general public is equally exposed outside of employment are not compensable, except where such diseases follow as an incident of an occupational disease, or where the exposure peculiar to the occupation makes such disease an occupational disease hazard. A disease arises out of the employment only if there be a direct causal connection between the conditions under which the work is performed and if the occupational disease follows as a natural incident of the work as a result of the exposure occasioned by the nature of the employment. An employer is not liable for compensation for any occupational disease which cannot be traced to the employment as a direct and proximate cause and is not recognized as a hazard characteristic of and peculiar to the trade, occupation, process, or employment or which results from a hazard to which the workman would have been equally exposed outside of the employment. If immediately preceding the date of his disablement or death, an employee was employed on active duty

with an organized fire * * * department of any municipality, * * * and his disease is that of *myocarditis, coronary sclerosis, pneumonia or its sequel,* and at the time of his employment such employee was given a thorough physical examination by a licensed doctor of medicine, and a written report thereof has been made and filed with such organized fire * * * department, which examination and report negatived any evidence of *myocarditis, coronary sclerosis, pneumonia. or its sequel,* the disease is presumptively an occupational disease and shall be presumed to have been due to the nature .of his employment." (Italics supplied.)

The relator contends that the Industrial Commission erred in determining that cerebral arteriosclerosis, one of the causes of her husband's death, was not an occupational disease of firemen, because the Industrial Commission committed error in awarding evidentiary status to § 176.011, subd. 15, (the statute that gives a presumption that coronary sclerosis is an occupational disease of firemen) and in using that as a basis for saying that relator's evidence was not the same as in the coronary sclerosis cases. Relator cites as controlling: Kellerman v. City of St. Paul, 211 Minn. 351, 1 N. W. (2d) 378; Ogren v. City of Duluth, 219 Minn. 555, 18 N. W. (2d) 535; Anderson v. City of Minneapolis, 258 Minn. 221, 103 N. W. (2d) 397; and Schwartz v. City of Duluth, 264 Minn. 514, 119 N. W. (2d) 822.

It thus becomes clear that the legal issue involved is whether the presumption of §176.011, subd. 15, applies to cerebral arteriosclerosis in firemen.

The presumption of § 176.011, subd. 15, is specifically limited to "myocarditis, coronary sclerosis, pneumonia or its sequel." The statute limits it in its application to firemen and other specific occupations. It is therefore clear that as to all other claims, both relating to disease and occupation, no such presumption applies. There must then be shown "a direct causal connection" between the occupation and the disease, and such direct causal connection must be shown by a fair preponderance of the evidence as was held in Hogan v. Twin City Amusement Trust Estate, 155 Minn. 199, 193 N. W. 122.

The respondents contend that it is clear from the record that the

Industrial Commission found that the presumption did not apply in the instant case by the use of the following language:

"There is no such legislative presumption in favor of cerebral arteriosclerosis or generalized arteriosclerosis being an occupational disease of firemen."

The record also indicates that the referee during the hearing ruled that while § 176.011, subd. 15, as it relates to firemen, was in effect on August 5, 1955, no evidence was introduced that would raise the presumption, and no statutory authority was submitted that would include cerebral arteriosclerosis under the presumptive rule.

This court discussed the proper use of a presumption in Ogren v. City of Duluth, 219 Minn. 555, 563, 18 N. W. (2d) 535, 539, where it said:

"The presumption in question was a mere rule of evidence; it created a rebuttable presumption of causation under the circumstances mentioned that a particular occupational disease resulted from the corresponding industrial process. * * *

* * * * *

"* * * It is well settled that a presumption is not evidence, but is rather a rule of law dictating decision on unopposed facts and shifting the burden of going forward with the evidence. Ryan v. Metropolitan L. Ins. Co. 206 Minn. 562, 289 N. W. 557. The presumption obtains until substantial proof to the contrary is introduced. Then it ceases and vanishes from the case. The case is then to be decided by the trier of fact the same as if the presumption had never existed."

We made it clear in Anderson v. City of Minneapolis, *supra*, that to permit an inference to be drawn from a presumption is to give the presumption evidentiary status, and that a presumption is not evidence but a rule which controls decision on unopposed facts in the absence of evidence to rebut it. It was held in the Anderson case that the evidence there clearly permitted an inference that the coronary sclerosis involved in that case was an occupational disease since the disease in evidence was myocarditis combined with coronary sclerosis,

definitely named in the statute as presumptively an occupational disease.

In Kellerman v. City of St. Paul, *supra,* this court held that it is for the legislature to fix the limits of class and disease, saying (211 Minn. 355, 1 N. W. [2d] 380):

"* * * The apparent high percentage of occurrence of coronary sclerosis among firemen demonstrates that the legislature was not arbitrary in providing for them as a class. Relator asserts that other occupations were shown to be susceptible to coronary sclerosis. The legislature 'is free to recognize degrees of harm, and it may confine its restrictions to those classes of cases where the need is deemed to be clearest. As has been said, it may "proceed cautiously, step by step," and "if an evil is specially experienced in a particular branch of business" it is not necessary that the prohibition "should be couched in all-embracing terms." ' "

The record indicates that on August 4, 1955, employee was on fire duty and retired for the evening. There was no alarm that evening. However, in the early morning of August 5, one of the other firemen heard a thud in the vicinity of decedent's bed. Apparently decedent had fallen out of bed. He returned to bed for a while and later was driven home. When he arrived there he was unsteady and rather helpless so he was sent to the hospital. On August 7, 1955, he appeared to have suffered a further physical ailment, possibly something of a cerebro-vascular nature. From this time on his course continued downhill, terminating in his death on November 17, 1955.

The attending physician on November 25, 1955, filed a death certificate stating that the immediate cause of death was—

"* * * cerebral thrombosis, encephalomalacia, due to hypertensive cardiovas disease * * *"

and listed as other significant conditions contributing to death but not related to the immediate cause,

"* * * terminal perforation of chronic duodenal ulcer—pulmonary embolism—bronchopneumonia."

The petitioner had a leading internist testify in her behalf. He testi-

fied that the employee was admitted to the hospital with a cerebral thrombosis which was the result of extensive arteriosclerosis. He also stated that this was all related to the nature of the employee's occupation. He said that he felt the type of work done by firemen is such that it helps to explain why arteriosclerosis is so free in those cases and why it is felt that it is an occupational disease. He further testified that arteriosclerosis often manifested itself in a variety of ways; in different people it will be found in the brain, heart, legs, kidneys, or it could be the arteries of the stomach or perhaps even the duodenum.

Another expert medical witness, appearing as a witness for the respondents, testified that he could see no relationship between the employee's arteriosclerosis and his occupation as a fireman. He stated:

"I would make such an opinion, form such an opinion on the basis of the fact that arteriosclerosis is generalized throughout the population, particularly in the 60-year-old men, that arteriosclerosis in my opinion does not appear selectively particularly to any given occupation. We see young people in our population dying of arteriosclerosis, not uncommonly but certainly not commonly but certainly not frequently either in their early 20's or 30's. The sort of things that you predicate here in your supposition indicate to me that one would not blame the occupation for the presence of arteriosclerosis that this is a basic process of aging. It is a degenerative process that exists to some extent in all human beings starting shortly after birth and continuing in all individuals up to the time of death."

A reading of all the testimony clearly indicates that there was a decided conflict in the expert medical opinion.

The commission has indicated in the instant case that it cannot find from the medical evidence that the relator has furnished sufficient proof that coronary sclerosis and cerebral arteriosclerosis are all a part of the same pathological picture. Petitioner's own medical expert said that "arteriosclerosis is a general progression and we assume that it acts practically the same wherever it goes, but for some unknown reason it localizes in one place more than in another."

In Anderson v. City of Minneapolis, *supra,* this court considered the applicable statutes and the cases that have been concerned with cor-

onary sclerosis of firemen and not arteriosclerosis generally. As we have already indicated, those cases commenced with the Kellerman case, followed by the Anderson and Schwartz cases. It will be noted in those cases that both the commission and this court were aided by the provisions of the Workmen's Compensation Act providing that where coronary sclerosis of firemen is involved, it may be presumed to have been due to the occupation of being a fireman. There is yet no legislative presumption provided in favor of cerebral arteriosclerosis or generalized arteriosclerosis being an occupational disease of firemen.

The commission made the following statement in its opinion:

"We do not find that medical or legal status present here [having made reference to the Kellerman, Schwartz, and Anderson cases]. And we cannot conclude that the evidence adduced in the case at bar establishes by a fair preponderance of the evidence, that cerebral arteriosclerosis is an occupational disease of firemen."

As we pointed out in the Kellerman case, under these circumstances a fact issue was presented, and the determination of that fact issue will not be disturbed on appeal where there is competent evidence to sustain it. Where medical experts disagree as to causal relationship between progress and development of an occupational disease and employment, as they do in the instant case, we must apply the foregoing rule.

In the final analysis the question here is whether the evidence, which turns largely on conflicting medical testimony, is such that it permits an inference to be drawn from the accepted facts to warrant the findings of the commission. We think it does.

Affirmed.

THOMAS GALLAGHER, JUSTICE (dissenting).

The commission's determination was based upon two findings or conclusions as follows:

(1)  "* * * We cannot state from the medical evidence that the petitioner has proved that coronary sclerosis and cerebral arteriosclerosis are all part of the same pathological picture."

(2) "* * * we cannot conclude that the evidence * * * establishes by a fair preponderance * * * that cerebral arteriosclerosis is an occupational disease of firemen."

The medical evidence may be summarized as follows: The autopsy listed as a final diagnosis the following:

"Arteriosclerotic cardiovascular disease—perforated ulcer—encephalomalacia—pulmonary embolisms.

*    *    *    *    *

"Generalized arteriosclerosis.

"Arteriosclerosis grade III to IV of the basal arteries of the brain with old organized and partly recanalized thrombosis of the left medial cerebral artery.

*    *    *    *    *

"Coronary sclerosis grade II.

"Small focal scaring of the myocardium of the posterior wall of the left ventricle.

"Arteriosclerosis grade III of the aorta with calcification of the cusps of the aortic valve.

*    *    *    *    *

"Arteriosclerosis grade I of both kidneys."

Subsequent thereto, the attending physician filed a death certificate stating that the immediate cause of the employee's death was "cerebral thrombosis, encephalomalacia, due to hypertensive cardiovas disease."

Dr. Moses Barron, testifying on petitioner's behalf, expressed the opinion that this thrombosis was a result of extensive arteriosclerosis and that it was related to the nature of employee's occupation as a fireman. Also that—

"* * * the type of work [of the employee] as described by the two assistant chiefs of the Fire Department, which * * * was a very unusual thorough description of the amount of the emotion and physical strain that is connected with that type of work * * * the tension and the emotional strain and the fact that they are practically never at ease

especially during the 24 hours when they are working * * *. I felt that this type of work is such that it really helps to explain why arteriosclerosis is so free in these cases, that it came to a point where it was felt that it is an occupational disease."

He testified that arteriosclerosis is a progressive disease; that different theories as to its causation are occupation, heredity, racial origin, diet, air pollution, or other causes; that arteriosclerosis may manifest itself or localize in specific areas although producing factors are probably the same; that cerebral thrombosis does not occur without the presence of arteriosclerosis; that in his opinion the employee's work as a fireman caused the arteriosclerosis of the brain which led to the cerebral thrombosis; and that the most deadly manifestations of arteriosclerosis are in the heart and in the brain.

Dr. Dwight C. Hoag, called by respondents, testified that arteriosclerosis is generalized throughout the population, particularly in older men; that it does not appear specifically in any particular occupational group; that the employee had a marked degree of arteriosclerosis in the cerebral blood vessels; that this was the cause of the thrombosis or blood clot forming; that the arteriosclerosis of the heart was not severe; that possible factors are thought to be diet, obesity, heredity, and hypertension; that arteriosclerosis localized in the heart or brain often can result in cerebral or cardiac accidents; that the two most common occur in the heart and brain; and that the underlying factor in either case may be the same.

Dr. George Berdez, also called by respondents, testified that thrombosis in the cerebral artery had been present 2 or 3 weeks prior to death; that the cause of the thrombosis would be damage to the blood vessels of the brain; that he found arteriosclerosis changes generally, but particularly in the brain; that arteriosclerosis is in part an aging process and the degree varies among individuals; that some theories in regard to causation were heredity, diet, air pollution, and occupation; that arteriosclerosis may manifest itself in various degrees in various portions of the body, including the brain, the heart, the legs, the kidneys, the stomach, or the duodenum.

It should be noted from the foregoing that the testimony of the medi-

cal expert called by petitioner to the effect that arteriosclerosis was the underlying cause of cerebral arteriosclerosis as well as coronary sclerosis was not disputed by respondents' medical experts. On the contrary, they gave substantial corroboration to such testimony in that both testified that arteriosclerosis might result in either cerebral or cardiac accidents and that the underlying factor in each case may be the same.

This medical testimony finds support in the autopsy filed in connection with the employee's death which manifested that his arteriosclerosis had affected both his cerebral and his coronary arteries. It seems clear from all such evidence that both coronary sclerosis and cerebral arteriosclerosis are part of the same pathological picture and that both find their origin in general arteriosclerosis. It would follow that the commission's finding to the contrary would be entirely inconsistent with the undisputed evidence on this issue.

The commission further determined that the evidence failed to establish that "cerebral arteriosclerosis is an occupational disease of firemen." It is to be noted that this finding has no relationship to the employer's contention here but is rather a generalization which would eliminate cerebral arteriosclerosis as an occupational disease of firemen in all cases. The only basis for such a determination was the testimony of the two medical experts called by respondents to the effect that arteriosclerosis from which cerebral arteriosclerosis arises is generalized throughout the population and is merely part of an aging process rather than an occupational disease. This testimony is substantially identical to that submitted by the employers' medical experts in four decisions of the commission (affirmed by this court)[1] which related to coronary sclerosis. There such experts testified that coronary sclerosis was not an occupational disease of firemen but found its origin in arteriosclerosis which was common to the population generally rather than to any particular occupational group. There, notwithstand-

---

[1]Anderson v. City of Minneapolis, 258 Minn. 221, 103 N. W. (2d) 397; Ogren v. City of Duluth, 219 Minn. 555, 18 N. W. (2d) 535; Kellerman v. City of St. Paul, 211 Minn. 351, 1 N. W. (2d) 378; Schwartz v. City of Duluth, 264 Minn. 514, 119 N. W. (2d) 822.

ing such testimony, the commission determined that coronary sclerosis was an occupational disease.

In the mind of the commission the distinction between the two situations, one of which related to arteriosclerosis generally and the other of which related to coronary sclerosis, was to be found in Minn. St. 176.011, subd. 15. The commission stated, "[T]he series of cases [on coronary sclerosis] were aided by the legislative statute that the disease was presumed to have been due to the occupation of being a fireman," the commission pointing out that "[t]here is no such legislative presumption in favor of cerebral arteriosclerosis or generalized arteriosclerosis."

This distinction would appear to give the statutory presumption involved in the coronary cases an evidentiary status which was not intended for it and not relied upon in the cases referred to.[2] Accordingly,

---

[2]Ogren v. City of Duluth, 219 Minn. 555, 564, 18 N. W. (2d) 535, 540, stated: "Giving respondent the benefit of the presumption could have resulted in no possible prejudice to relator if the rules laid down in our decisions concerning presumptions were followed by the commission. For lack of affirmative showing to the contrary, we must assume that the commission observed these rules in determining the facts. It is well settled that a presumption is not evidence, but is rather a rule of law dictating decision on unopposed facts and shifting the burden of going forward with the evidence. Ryan v. Metropolitan L. Ins. Co. 206 Minn. 562, 289 N. W. 557. The presumption obtains until substantial proof to the contrary is introduced. Then it ceases and vanishes from the case. The case is then to be decided by the trier of fact the same as if the presumption had never existed. State v. One Buick Sedan Automobile, 216 Minn. 129, 12 N. W. (2d) 1; Roberts v. Metropolitan L. Ins. Co. 215 Minn. 300, 9 N. W. (2d) 730; Duff v. Bemidji Motor Service Co. 210 Minn. 456, 299 N. W. 196. Here, the employer introduced contradictory proof sufficient to overcome the presumption. Respondent introduced proof sufficient to sustain it. In short, the presumption, if applied according to our rules, was only a tentative rule of decision until displaced by the proofs to the contrary. At that juncture it had served the only purpose of a presumption— it had become *functus officio,* so to speak, and disappeared from the case. As said in the Ryan case (206 Minn. 570, 289 N. W. 561), 'The presumption, as rule of law compelling decision, was dispelled by the evidence.' The process of decision occurred after the presumption had vanished from the case. The fact was then determined upon all the evidence without considering the presumption as evidence. Hence, the decision cannot be said to be the result of applying the presumption to the evidence."

it would seem clear that the decision herein is entirely inconsistent with the decisions in the cases cited and will result in a distinction between the two types of arteriosclerosis which is unjustified. In substance, it will mean that arteriosclerosis arising through stress and strain as experienced by firemen in their occupation as such will be compensable as an occupational disease when its terminal is the heart, but will not be so regarded when its terminal is the brain. There seems to be no logical basis for such a differentiation.

MURPHY, JUSTICE (dissenting).

I join in the dissent of Mr. Justice Thomas Gallagher.