Classia DUNN, widow of Jackie T. Dunn, deceased employee, Relator,

v.

VIC MANUFACTURING COMPANY and Argonaut Insurance Company, Respondents,

Vic Manufacturing Company and Associated Indemnity Company, Respondents,

Vic Manufacturing Company and Liberty Mutual Insurance Company, Respondents,

Vic Manufacturing Company and Iowa Mutual Insurance Company, Respondents,

Vic Manufacturing Company and Federated Mutual Insurance Company, Respondents,

and

Blue Cross & Blue Shield of Minnesota, intervenor, Respondent.

No. 82–578.

Supreme Court of Minnesota.

Dec. 17, 1982.

Rehearing Denied Feb. 1, 1983.

Sigal & Miller, Minneapolis, for relator.

Gilmore, deLambert, Aafedt, Eustis & Forde, Janet Monson and Curtis C. Gilmore, Minneapolis, for Vic Mfg. Co. and Argonaut Ins. Co.

Robert L. Gjorvad, St. Paul, for Vic Mfg. Co. and Associated Indem. Co.

J. Mark Catron, St. Paul, for Vic Mfg. Co. and Liberty Mut. Ins. Co.

Fitch & Johnson, Minneapolis, for Vic Mfg. Co. and Iowa Mut. Ins. Co.

Gary M. Hagstrom, Minneapolis, for Vic Mfg. Co. and Federated Mut. Ins. Co.

Robert J. Milis, St. Paul, for Blue Cross & Blue Shield of Minnesota, intervenor.

WAHL, Justice.

Certiorari on the relation of Classia Dunn, the widow of employee Jackie Dunn, to review a decision of the divided Workers' Compensation Court of Appeals which denied her claim for dependency compensation on the ground, advanced by Judge Gard, that the claim was barred and the ground, advanced by Judge Rieke and Judge Adel but rejected by Judge Gard and Judge McCarthy, that the evidence did not support findings by Compensation Judge Parker determining that employee had been disabled by an occupational disease on October 5, 1979, the date of his death, and that his disease had been a substantial contributing factor in hypoxemia which had resulted in his death. Having concluded that the claim is not barred and that the findings of the compensation judge have substantial evidentiary support, we reverse and remand for reinstatement of those findings and the compensation award.

In October 1978 employee suffered a disabling back injury in a work-related accident and never returned to work. On October 5, 1979, his wife returned from her job and discovered that he had died. An autopsy revealed no evidence of coronary artery disease or a heart attack, but microscopic examination of employee's lungs showed that he had had severe emphysema with honeycombing of upper lobes of the lungs and also had had massive pulmonary fibrosis with siderotic nodules. The pathologist who performed the autopsy concluded that the probable cause of employee's death was cardiac arrhythmia caused by insufficient oxygen in his blood.

Relator initiated this proceeding to obtain dependency benefits on the ground that the fibrosis was causally related to employee's work for the employer as a sandblaster and had been a substantial contributing cause of the hypoxemia which had resulted in the fatal arrhythmia. The employer and its compensation insurers who had furnished coverage during the period of employee's employment denied liability on the grounds that the fibrosis was not an occupational disease and also that it had not been a substantial contributing cause of the hypoxemic condition which had resulted in employee's death.[1]

Employee began working as a sandblaster for the employer in 1957 at the age of 21. The work required him to direct a hose through which fine steel grits were forced at metal tanks and sometimes to spray a finer dust through the hose at aluminum objects. A fellow employee and a witness for the employer testified that the sandblasters did not use sand in this work, although employee's treating doctor testified that employee had told him that during the first years of his employment he had done so and this witness said that he himself had never seen a case in which sand was not used in sandblasting at that time. Whatever the composition of the materials, there is no dispute that employee was exposed to a considerable amount of dusts. He wore a protective hood through which fresh air circulated, but the hood was not tight and dust seeped inside it. Relator testified that employee's clothes were dirty when he returned from work, he had dirt on his face and eyebrows, blew dirt from his nose, and coughed "black stuff." He had frequent colds and sometimes complained of chest pains. Relator said also that after a fellow worker left the department and was not

1. The compensation judge ultimately imposed liability only on Argonaut Insurance Company, the employer's insurer from September 1, 1965, to January 1, 1974, and there has been no appeal from that determination.

replaced employee would complain that his job was too much work for one person, but he did not miss work. She said that the employer finally permitted him to transfer to an assembly work job in 1966 or 1967 after he obtained a "medical slip" from his doctor.

In 1967 employee had minor surgery and at that time chest X-rays showed an infiltrate in his lungs which his doctor thought might be sarcoidosis. About 1970 employee began to have difficulty breathing at night and also became short of breath with physical exertion. In 1977, in the course of treatment for a skin disease, he was referred to Dr. Charles Drage, a specialist in pulmonary medicine and a professor in the University of Minnesota Medical School. X-rays then taken showed interstitial infiltrates in employee's lungs, and pulmonary function tests showed that employee had severe obstruction in exhalation of breath, marked increase in lung volumes, and lowered arterial oxygen saturation. Dr. Drage testified that he considered employee's case confusing initially because the pulmonary function tests fit with chronic obstructive lung disease, bronchitis and emphysema (both of which he diagnosed), but the X-rays and employee's work history fit better with silicosis. He then concluded that the emphysema, which he related causally to employee's smoking a pack of cigarettes a day since the age of 17, was employee's major problem and treated employee for it during his lifetime.

Dr. Drage testified that he agreed with the pathologist's conclusion that employee's death was due to cardiac arrhythmia resulting from hypoxemia. Based on the autopsy report and his review of slides of employee's lung tissue, Dr. Drage concluded that the massive amount of fibrosis in employee's lungs had been more important than his admittedly severe emphysema. He expressed the opinions that employee's death was directly related to his hypoxemia, that this condition was directly related to the condition of employee's lungs, and that his fibrosis had been a significant factor in the development of the hypoxemia. Dr. Drage also held the opinion that employee's fibrosis had been caused by work exposure to iron oxides and probably to silica.[2]

Dr. John Coe, chief pathologist at Hennepin County Medical Center and board-certified in forensic pathology, agreed that employee's extensive fibrosis and emphysema were significant causes of the hypoxemia. He said that fibrosis is often found in association with emphysema but that emphysema did not cause the extensive scarring found in employee's lungs and that chronic recurring exposure to toxic dusts had been required to cause the fibrotic changes. It was his opinion that employee's work exposure had precipitated or contributed to development of the disease. Informed that the exact composition of the material employee had inhaled was not known, Dr. Coe still expressed the opinions that it was the etiological agent of employee's fibrosis and that this disease of itself had significantly reduced his pulmonary function and thus had been a significant factor in his death because it, as well as the emphysema, had produced the hypoxemic condition.

Dr. Mark Johnson, a board-certified internist, agreed that employee's death had probably been caused by cardiac arrhythmia precipitated by oxygen insufficiency. He expressed the opinion that employee's death was due to chronic obstructive lung disease rather than to fibrosis, in part because of Dr. Drage's initial diagnosis and in part because of what the witness regarded as a lack of evidence directly relating employee's work to his death. He suggested that the fibrosis could have been idiopathic, but admitted that it was inconsistent with contaminants commonly found in the air of factories or manufacturing areas in Minneapolis, that it had been massive in extent, and that lung damage caused by it could have produced the same symptoms as

2. The witness said that siderotic nodes, resulting from iron oxide deposits in the lungs, could be identified on microscopic examination. Silica particles could not be thus identified, but the presence of refractile bodies under polarized light also suggested to him that employee had been exposed to silica. Dr. John Coe agreed that silicosis could not be ruled out.

chronic obstructive lung disease. He had not examined the autopsy slides of employee's lungs.

Dr. Ronald Vessey, also a board-certified internist, similarly agreed with the pathologist's opinion on the immediate cause of employee's death, but expressed the opinion that hypoxemia had been caused primarily by bronchitis and emphysema. Based on chest X-rays obtained in June 1979, he thought employee had had silicosis or siderosis which was "simple" (nodules not more than dime size) and said that siderosis is a fairly benign condition and that silicosis, if present, was not work related because employee presumably was not exposed to silica in his work. This witness also did not review the autopsy slides and did not feel that the autopsy findings were better sources of information about employee's chest diseases than the X-rays he had reviewed, but he agreed that emphysema could not have caused the extensive fibrosis in employee's lungs. He also expressed the opinion that the fibrosis could not have caused significant hypoxemia.

The compensation judge accepted the opinions of all the medical experts that employee had suffered cardiac arrhythmia due to hypoxemia and the opinions of Dr. Coe and Dr. Drage that employee's exposure to dust from the steel grits and other materials was a substantial contributing factor in his development of fibrosis and that this disease was a substantial contributing factor in his hypoxemia. Judge Parker found also that the fibrosis was an occupational disease and that employee's disability therefrom occurred at the same time the disease was contracted, on October 5, 1979, the date of his death.

As stated, four members of the Workers' Compensation Court of Appeals took part in the decision of the employer's appeal. Judge Rieke, Judge Adel, and Judge McCarthy agreed that employee suffered disablement from occupational disease on the day of his death; Judge McCarthy and Judge Gard agreed that Judge Parker's findings relating to causal relationship were supported by the evidence; and Judges Rieke and Adel disagreed and substituted findings that the preponderance of the evidence did not show that employee's work exposure was a substantial contributing factor in the development of his pulmonary fibrosis, that he died of respiratory failure associated with cardiac arrhythmia resulting from hypoxemia, and that the fibrosis had not been a substantial contributing factor in that condition. Judge Gard voted also to deny compensation because in his view Minn.Stat. § 176.66, subd. 3 (1965), applies to bar relator's claim. That statute provided in part:

> Neither the employee nor his dependents are entitled to compensation for disability or death resulting from occupational disease, unless such disease is due to the nature of his employment as defined in section 176.011, subdivision 15, and was contracted therein within 12 months previous to the date of disablement; except in the case of silicosis or asbestosis, in which case disablement of the employee must occur within three years from the date of such employee's last exposure with an employer in an employment to the nature of which the disease may have been a hazard * * *.

Judge Gard assumed that employee had to have "contracted" his disease by 1966 when he stopped sandblasting and was no longer exposed to the dusts incident to that work. Because employee did not suffer disablement within 12 months after quitting that work, Judge Gard concluded that section 176.66, subd. 3, bars his dependents from obtaining compensation. While we agree that employee's fibrosis, if work related, must have had its inception during the years he was a sandblaster, and thus that from a medical standpoint the disease was "contracted" during that time, we have held that a progressive occupational disease is legally contracted, not with the first appearance of symptoms, but "when it manifests itself so as to interfere with bodily functions to such an extent that the employee can no longer substantially perform the duties of his employment." *Anderson v. City of Minneapolis*, 258 Minn. 221, 226,

103 N.W.2d 397, 401 (1960). In this case there is no evidence that employee left the sandblasting department because he could not perform his work and he missed no time from work because of his occupational disease either in that department or in his subsequent work as an assembler. Section 176.66, subd. 3, was repealed, effective July 1, 1973. Act of May 24, 1973, ch. 643, §§ 12 and 13, 1973 Minn.Laws 1584, 1594. In the absence of any evidence that employee had contracted his disease more than 12 months before July 1, 1973, the repealed provision cannot defeat relator's claim. *See Klimmek v. Independent School Dist. No. 487*, 299 N.W.2d 501 (Minn.1980).

■ Since Judge Gard's ground for denial of compensation was erroneous, the compensation judge's findings on the factual issues of whether employee's fibrosis was an occupational disease and whether it was a substantial contributing factor in the hypoxemia which led to his death were in effect affirmed by operation of law because the participating members of the Court of Appeals divided evenly on the correctness of those findings. *Barlau v. Minneapolis-Moline Power Implement Co.*, 214 Minn. 564, 9 N.W.2d 6 (1943). Consequently, his findings are those presented here for review.

■ We have concluded that these findings are supported by substantial evidence. Employee worked for an 8-year period in an environment in which he was exposed constantly to a large amount of dusts resulting from the sandblasting operation. During that period he had colds and a cough and in subsequent years developed other respiratory symptoms which medical witnesses agreed could be indicative both of emphysema and of pulmonary fibrosis. The medical witnesses agreed also that the probable cause of employee's death was the cardiac problem caused by hypoxemia. Two eminent medical experts expressed the unqualified opinions that employee's exposure to the dusts in his work as a sandblaster was a substantial contributing factor in the development of his pulmonary fibrosis and that this disease was a substantial contributing

factor in the oxygen insufficiency which led to his death. Two other expert medical witnesses expressed contrary opinions, but resolution of the conflicts in these expert opinions is the function of the trier of fact. *Gaspers v. Minneapolis Electric Steel Castings Co.*, 290 N.W.2d 743 (Minn.1979).

Relator is awarded attorney fees of $400.

Reversed and remanded.

PETERSON, J., took no part in the consideration or decision of this case.