Susan M. FREEMAN, Respondent,

v.

ARMOUR FOOD COMPANY,
self-insured, Relator,

Farmers Insurance Group,
intervenor, Respondent.

No. C6–85–1009.

Supreme Court of Minnesota.

Feb. 14, 1986.

Gary C. Reiter, Minneapolis, for relator.

William J. Hennessy, St. Paul, for Freeman.

John H. Guthmann, St. Paul, for intervenor.

SIMONETT, Justice.

The compensation judge and the Workers'· Compensation Court of Appeals held that a no-fault auto carrier was entitled to intervene in an employee's claim proceeding to seek reimbursement for no-fault benefits paid at a time when the employee was also entitled to workers' compensation benefits. We affirm. We also affirm, but on different grounds, the WCCA's award of reimbursement to the no-fault carrier.

As a result oɪ repeated strain of her neck and shoulder muscles while working for relator Armour Food Company, employee Susan M. Freeman sustained a bilateral thoracic outlet syndrome. For this disability, which required two surgeries, Armour, a self-insured employer, was ordered to pay the employee temporary total disability benefits from August 4, 1978, and continuing "as her disability warrants." On July 11, 1980, while still disabled for the thoracic outlet syndrome, Freeman was involved in a nonwork-related auto accident. Her car was rear-ended and she had pain in her

neck and upper back, along with a new type of pain in her arms.

Following the auto accident, Armour continued to pay Freeman workers' compensation benefits for 5 months, stopping payment on December 14, 1980. A week earlier, on December 6, 1980, intervenor-respondent Farmers Insurance Group, which carried Freeman's no-fault auto coverage, commenced paying Freeman no-fault benefits. Farmers continued to pay Freeman no-fault disability and income loss benefits for almost 2 years, to November 1, 1982, by which time it had paid out its limits of $20,000 for two stacked auto policies. The no-fault benefits having been exhausted, employee Freeman promptly, in December 1982, petitioned for temporary total disability benefits from November 1, 1982, the date the no-fault benefits stopped. Freeman's petition also sought permanent partial disability benefits for each arm and retraining benefits. Farmers petitioned to intervene in the proceeding. It was Farmers' contention that Armour should have continued to pay temporary total compensation benefits after the auto accident and, because workers' compensation benefits are primary under Minn.Stat. § 65B.61 (1984),[1] that Farmers had a reimbursement claim against Armour. The petition for intervention was granted, and thereafter Freeman - amended her petition to claim temporary total benefits from December 14, 1980, the date Armour had discontinued benefits.

After a hearing on March 7, 1984, Compensation Judge Nadine James found that Susan Freeman was temporarily and totally disabled from the thoracic outlet syndrome from August 24, 1979, through March 7, 1984, and that this work-related disability was continuing. She also found the employee had been paid no-fault benefits of almost $20,000 for the nonwork-related auto accident injury. The compensation judge then noted that under *Griebel v.*

*Tri-State Insurance Company of Minnesota,* 311 N.W.2d 156 (Minn.1981), when an employee has concurrent disabilities caused independently by both a job-related injury and a nonjob-related injury, that both compensation and no-fault benefits are to be paid, with an offset to the no-fault carrier for the primary workers' compensation benefits paid. The compensation judge further found that the auto accident delayed the healing of the thoracic outlet injury; that this delay started on December 14, 1980, about 5 months after the auto accident when Armour stopped its compensation payments; and that the delay continued for almost a year, to December 11, 1981, the date Freeman applied for rehabilitation assistance. Consequently, the judge ruled that—

a. From July 11, 1980, through December 14, 1980, Armour was liable for compensation benefits and Farmers was liable for no-fault benefits;

b. From December 14, 1980, through December 10, 1981, only Farmers was liable for no-fault payments; and

c. After December 11, 1981, both Armour and Farmers were liable with Farmers entitled to an offset.[2]

Based on these findings and conclusions, the compensation judge ordered Armour to pay Farmers approximately $7,000, representing the offset or reimbursement to which Farmers was entitled for the week of December 6, 1980, and for the period December 11, 1981, to November 1, 1982.

Farmers appealed to the Workers' Compensation Court of Appeals. It felt it should also have reimbursement for the "middle" period, December 15, 1980, to December 10, 1981. Before the WCCA, for the first time, the issue of jurisdiction to award reimbursement was raised. On this issue, the WCCA held, Judge Gard dissenting, that while the Workers' Compensation

---

**1.** Minn.Stat. § 65B.61, subd. 1 (1984), provides: "Basic economic loss benefits shall be primary with respect to benefits, except for those paid or payable under a workers' compensation law * * *."

**2.** *See* footnote 5, *infra.*

Division did not have jurisdiction to decide the propriety and amount of no-fault benefits, it did have jurisdiction to award reimbursement to a no-fault carrier out of a workers' compensation award. The WCCA disagreed, however, with the compensation judge's decision on the amount of reimbursement. It ruled Armour must reimburse Farmers for the period December 15, 1980, through December 10, 1981, as well as for the period December 11, 1981, to November 1, 1982.

Armour, by certiorari, now appeals to this court, contending, first, that the Workers' Compensation Division lacks jurisdiction to award reimbursement to an auto no-fault carrier, and, second, that if jurisdiction exists, the WCCA erred in awarding more reimbursement to the no-fault carrier than was awarded by the compensation judge.

## I.

The first issue is whether the Workers' Compensation Division has subject matter jurisdiction to award reimbursement to a no-fault carrier out of a workers' compensation award. We hold subject matter jurisdiction exists.

Armour relies on *Cooper v. Younkin*, 339 N.W.2d 552 (Minn.1983). The issue in *Cooper* was whether the WCCA could order a subrogation credit for an employer-insurer out of an employee's recovery of uninsured motorist insurance benefits. We said no. There was no statutory authority giving an employer-insurer a subrogation credit in a recovery of *contractual* unin-

sured motorist benefits and, we said, "the Workers' Compensation Court of Appeals was powerless to apply a remedy of its own devising." 339 N.W.2d at 554. Armour points out that while a no-fault carrier has a right of reimbursement under the No-Fault Act, Minn.Stat. § 65B.54, subd. 3 (1984),[3] no right of offset is found, at least not explicitly, in Chapter 176. Armour further points out that the Workers' Compensation Act expressly provides for reimbursement of health insurance carriers but that no-fault insurers are conspicuously absent from this statutory grant of authority.[4] From this Armour argues that there is no statutory authority for the WCCA to award reimbursement; that the WCCA lacks power to fashion an equitable remedy on its own; and, therefore, that the Workers' Compensation Division lacks subject matter jurisdiction to make a reimbursement award to a no-fault carrier.

We disagree. Prior to the enactment of Minn.Stat. § 176.191, subd. 3 (1984), and prior to *Cooper*, this court decided *Lemmer v. Batzli Electric Co.*, 267 Minn. 8, 125 N.W.2d 434 (1963). There we held that a health carrier which had mistakenly paid insurance benefits not knowing that workers' compensation coverage was applicable, was entitled to intervene in a compensation proceeding and was entitled to an order for reimbursement. We see no reason why here, too, the WCCA cannot order reimbursement to a no-fault carrier out of a compensation award. Unlike in *Cooper*, the WCCA is not being asked to create a new reimbursement remedy.

**3.** Minn.Stat. § 65B.54, subd. 3 (1984), provides:
    A claim for basic economic loss benefits shall be paid without deduction for the benefits which are to be subtracted pursuant to section 65B.61, if these benefits have not been paid to the claimant before the reparation benefits are overdue or the claim is paid. The obligor is entitled to reimbursement from the person obligated to make the payments or from the claimant who actually receives the payments.

**4.** Minn.Stat. § 176.191, subd. 3 (1984), provides:
    If a dispute exists as to whether an employee's injury is compensable under this chapter and the employee is otherwise covered by an

insurer pursuant to chapters 62A [Accident and Health Insurance], 62C [Nonprofit Health Service Plan Corporations Act] and 62D [Health Maintenance Act of 1973], that insurer shall pay any medical costs incurred by the employee for the injury and shall make any disability payments otherwise payable by that insurer in the absence of or in addition to workers' compensation liability. If the injury is subsequently determined to be compensable pursuant to [chapter 176], the workers' compensation insurer shall be ordered to reimburse the insurer that made the payments * * *.

Here reimbursement has already been granted by the legislature. The fact that the right of reimbursement appears in Chapter 65B rather than Chapter 176 makes it no less a remedy which the WCCA should recognize.[5] Of course, the WCCA has "no jurisdiction in any case that does not arise under the workers' compensation laws." Minn.Stat. § 175A.01, subd. 2. *See also Hagen v. Venem*, 366 N.W.2d 280, 283 (Minn.1985) (the WCCA is limited to "the construction and application of the Workers' Compensation Act"). This means that the WCCA lacks jurisdiction to determine a no-fault carrier's liability to pay no-fault benefits, but this need not conflict with the WCCA's jurisdiction to decide workers' compensation liability. Here, as in a health carrier's intervention, the no-fault intervenor simply presents proof of its no-fault payments. It is for the compensation judge and the WCCA to decide if workers' compensation liability exists for the pertinent time periods. If so, then the compensation judge or WCCA orders reimbursement from the compensation benefits to the no-fault carrier.[6]

■ Because the WCCA has the power to grant reimbursement and because the no-fault carrier may gain or lose by the WCCA's decision, it follows that the no-fault carrier has a right to intervene in a workers' compensation case to protect its reimbursement rights. Minn.Stat. § 176.-361, subd. 1 (1984); *Lemmer v. Batzli Electric Co.*, 267 Minn. 8, 11, 125 N.W.2d 434, 436 (1963). It should be noted that this is only a right to intervene. Chapter 176 does not give the no-fault carrier standing to initiate any claim petition on its own.

## II.

The next issue is whether the compensation judge properly determined the no-fault carrier's reimbursement. We think not.[7]

At the time of the auto accident on July 11, 1980, Susan Freeman remained disabled from the thoracic outlet syndrome. Although her physical condition was improving, it is undisputed that the syndrome's permanent residual effects necessitated vocational retraining. Therefore, regardless of the auto accident, Freeman would have remained temporarily totally disabled, as we have defined it,[8] until she was vocationally rehabilitated, and the no-fault carrier making payments during this period would be entitled to reimbursement. The compensation judge, however, using a "com-

---

5. As we said in *Lemmer v. Batzli Electric Co.*, 267 Minn. 8, 19, 125 N.W.2d 434, 441 (1963), there are persuasive policy reasons for having the WCCA award reimbursement: Multiple litigation and involvement of another forum to enforce the remedy is avoided; the likelihood of an employee's double recovery is eliminated; and, in cases where compensation payments are held up over a liability dispute, the no-fault carrier has an incentive to pay no-fault benefits promptly, knowing it may be entitled to subsequent reimbursement.

6. In this case the compensation judge made rulings assessing "liability for payment of benefits" against Farmers. Thus Farmers was found to be liable for no-fault payments from the date of the automobile accident to December 14, 1980, although it did not start payments until December 6, and, again, Farmers was ruled purportedly liable for no-fault payments after November 1, 1982, the date Farmers stopped payments. While the compensation judge may make findings on what no-fault benefits have been paid, she lacks jurisdiction to determine a no-fault carrier's liability, *i.e.*, what payments should be, but have not been, paid.

7. Armour raises a threshold issue. It contends the WCCA exceeded its scope of appellate review because the issue of whether Freeman was entitled to temporary total disability benefits for the period December 15, 1980, to December 10, 1981, was not raised in Farmers' notice of appeal from the compensation judge's decision to the WCCA. In its notice of appeal, Farmers said it was appealing from that part of the judge's order "failing to find an overpayment for the period December 15, 1980 to December 10, 1981." Armour is arguing semantics. The WCCA correctly pointed out that a failure to find an overpayment was not the real issue but whether the employee was entitled to temporary total disability benefits for this period of time. By rephrasing the issue, the WCCA did not, as Armour contends, change the issue.

8. *See Schulte v. C.H. Peterson Construction Co.*, 278 Minn. 79, 83, 153 N.W.2d 130, 134 (1967) ("The concept of temporary total disability is primarily dependent upon the employee's ability to find and hold a job, not [her] physical condition").

monsense approach," reasoned that there had been a delay in rehabilitation "attributable solely to the automobile accident." She estimated this delay at approximately 1 year, from December 15, 1980, the date Armour stopped paying workers' compensation, to December 10, 1981, when Freeman first applied for rehabilitation. Accordingly, Freeman was denied workers' compensation and Farmers, consequently, was denied an offset for this period.

■ We need not decide whether workers' compensation is payable during a delay in rehabilitation attributable solely to a nonwork-related injury, because, in this case, the extent of any delay and its effect on the period of temporary total disability is speculative. The only medical testimony regarding a delay is Freeman's doctor's statement that the auto accident "resulted in some retardation of [Freeman's] recovery and rehabilitation." There is, however, no testimony, expert or lay, regarding the delay's magnitude. We think an employer who argues that its workers' compensation liability for an admittedly work-related injury is temporarily suspended due to a nonwork-related delay in rehabilitation ordinarily should produce some medical evidence regarding the extent of the delay. *Cf. Sullivan v. Hagstrom Construction Co.,* 244 Minn. 271, 277–78, 69 N.W.2d 805, 809 (1955). But here there has been no showing that the job-related injury was not a substantial cause of the temporary total disability during the pertinent times involved. Therefore, although we disagree with the analysis of the WCCA,[9] we agree with the result it reached, namely, that Farmers was also entitled to reimbursement for the period December 15, 1980, to December 10, 1981.

Affirmed.

9. The WCCA disagreed with the compensation judge, instead ruling that workers' compensation benefits could not be terminated absent "gross fault or deliberate action on the part of the employee." There was, of course, no intervening fault on the part of Freeman but, more to the point, any discussion of intervening fault is irrelevant. The so-called "rash undertaking" analysis argued by Farmers and adopted by the WCCA, applies to aggravation of a work-related

injury. Here we are dealing with a work-related injury and a nonwork-related injury, with the workers' compensation carrier only responsible for the former and the no-fault auto carrier liable for the latter. Although the consequences of the two injuries overlap and are difficult to distinguish, Armour should be liable only for the consequences of the thoracic outlet syndrome.